# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 19, 2007

Charles R. Fulbruge III
Clerk

No. 06-30584

PALMER VENTURES LLC; JOHN M ENGQUIST

Plaintiffs-Appellees

v.

DEUTSCHE BANK AG

Defendant-Appellant

Appeal from the United States District Court
for the Middle District of Louisiana, Baton Rouge
USDC No. 3:04-CV-0706

Before DENNIS, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:[*]

In this appeal, Defendant-Appellant Deutsche Bank AG ("Deutsche Bank") urges us to reverse the order of the district court denying Deutsche Bank's motion to compel arbitration. Deutsche Bank is not a signatory to the arbitration agreement it seeks to enforce, but instead relies on equitable estoppel and agency principles to establish grounds to compel arbitration. Having reviewed the record and the district court's order, we AFFIRM the decision to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

deny arbitration and return this case to the district court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

The underlying claims in this case arise from a tax strategy gone awry. Specifically, Plaintiff-Appellee Palmer Ventures, L.L.C. ("Palmer Ventures") and its sole owner Plaintiff-Appellee John M. Engquist ("Engquist") (collectively, "Plaintiffs") allege that the defendants conspired to fraudulently induce Plaintiffs into participating in a tax strategy known as Bond Linked Issue Premium Structure ("BLIPS"). Plaintiffs assert that Deutsche Bank, KPMG, L.L.P. ("KPMG"), Presidio Advisory Services ("Presidio"), and the law firm of Sidley, Austin, Brown and Wood, L.L.P. ("Sidley"), among others, devised BLIPS, were aware of its potential illegality, and fraudulently conspired to market it to others.

The idea behind the BLIPS tax strategy was to use various trades in foreign currencies to create capital losses in order to offset capital gains for tax purposes. As described by the parties, to facilitate the BLIPS strategy, Deutsche Bank loaned Palmer Ventures $58.7 million, which was put into a "Funding Account" at Deutsche Bank. The amount in the Funding Account was then transferred to an "Investment Account" that Palmer Ventures maintained with Deutsche Bank Securities, Inc. ("DBSI"), an indirect subsidiary of Deutsche Bank. To this amount, Palmer Ventures added a capital contribution of $1.54 million, which it received from Engquist. Deutsche Bank maintained a lien on its loan to Palmer Ventures as collateral and perfected a security interest in the Investment Account. Palmer Ventures then assigned the funds in the Investment Account to Castle Strategic Investment Fund, L.L.C. ("Castle"), which conducted the foreign currency trades. The IRS ultimately determined that BLIPS and other similar strategies were abusive tax shelters, leading to a multitude of suits across the country, including the instant case.

To participate in the BLIPS strategy, Plaintiffs entered into numerous agreements, several of which are relevant to this appeal. Deutsche Bank and Palmer Ventures signed a Credit Agreement on September 30, 1999, which set the terms of Deutsche Bank's $58.7 million loan to Palmer Ventures. The Credit Agreement stated that the loan proceeds were to first go to the Funding Account maintained by Palmer Ventures at Deutsche Bank and then be transferred to Palmer Ventures' Investment Account at DBSI. The Credit Agreement also provided that Deutsche Bank would maintain a lien on the loan proceeds as collateral for the loan by means of the Account Control Agreement. The Account Control Agreement was attached as Exhibit C-2 to the Credit Agreement and was made between DBSI, Deutsche Bank, and Palmer Ventures. It was used to perfect Deutsche Bank's security interest in the loan proceeds.

Palmer Ventures and DBSI signed a Customer's Agreement on September 16, 1999. The Customer's Agreement created Palmer Ventures' bank account at DBSI, which became the Investment Account for the BLIPS strategy. This is also the agreement that contains the arbitration clause at issue in this case, which states as follows:

> 14. Arbitration:
>
> (i) Arbitration is final and binding on the parties.
>
> (ii) The parties are waiving their right to seek remedies in court, including the right to jury trial.
>
> * * *
>
> The UNDERSIGNED AGREES, and by carrying an Account of the Undersigned you agree, that except as inconsistent with the foregoing, all controversies which may arise between us concerning any transaction of [sic] construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.

The Customer's Agreement goes on to state that the arbitration will be governed by the rules of the National Association of Securities Dealers, Inc.

The final relevant agreement is the September 15 Representation Letter, which was sent to Engquist on September 15, 1999, and states "[i]n consideration of our execution of the Transactions, you hereby represent, warrant and acknowledge to us, Deutsche Bank AG, Cayman Islands Branch and to our affiliates for which we act as agent in connection with the Transactions (collectively, 'Deutsche Bank') that . . . ." The letter then goes on to list various disclaimers, such as that Deutsche Bank had made no representations or guarantees regarding the Transactions, including the tax consequences, and that "you" (Engquist) had not relied on any such representations or guarantees. The letter is on DBSI letterhead and contains a signature line for DBSI; however, given the quotation above, it is possible to construe the reference to "us" as Deutsche Bank AG instead of DBSI.

## II. PROCEDURAL HISTORY

Following the IRS's determination that the BLIPS strategy was an abusive tax shelter, Plaintiffs filed suit in Louisiana state court against Deutsche Bank, KPMG, Presidio, and Sidley, among others, for breach of fiduciary duty, fraud, and conspiracy. Deutsche Bank removed the case to federal court on October 1, 2004, based on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 205, claiming that the Convention covered the arbitration agreement found in the Customer's Agreement between Palmer Ventures and DBSI.[1] Plaintiffs filed a motion to remand, which the district court denied with the caveat that a closer look at whether Deutsche Bank could actually enforce the arbitration agreement might ultimately result in a remand for lack of subject matter jurisdiction.

Deutsche Bank then filed a motion to compel arbitration based on the Customer's Agreement. On May 16, 2006, the district court denied the motion

---

[1] Section 205 permits the removal of cases that "relate[] to an arbitration agreement" that falls under the Convention.

to compel arbitration, finding that Deutsche Bank, as a non-signatory to the agreement, could not enforce it. The district court then noted that its ruling meant that no subject matter jurisdiction existed under 9 U.S.C. § 205 and gave Deutsche Bank twenty days to assert another basis for federal jurisdiction. On June 2, 2006, Deutsche Bank filed a notice of appeal of the order denying arbitration pursuant to 9 U.S.C. § 16(a). We stayed any further action in the district court and now consider Deutsche Bank's appeal.

## III. STANDARD OF REVIEW

The standard of review applicable to this case depends on the theory of arbitration being discussed. We generally review the grant or denial of arbitration de novo. Garrett v. Circuit City Stores, Inc., 449 F.3d 672, 674 (5th Cir. 2006). However, we use an abuse of discretion standard to review the district court's application of equitable estoppel to decide whether to compel arbitration. Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 528 (5th Cir. 2000). We have also indicated that a district court's conclusion regarding the existence of an agency relationship should be reviewed for clear error. Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 (5th Cir. 2003) (noting that the Fifth Circuit appears to review agency findings for clear error, but declining to reach the issue).

In general, courts recognize a strong federal policy in favor of arbitration, and any doubts about the scope of an agreement are to be resolved in favor of arbitration. Safer v. Nelson Fin. Group, Inc., 422 F.3d 289, 294 (5th Cir. 2005). However, we have also stated that "we will allow a nonsignatory to invoke an arbitration agreement only in rare circumstances." Westmoreland v. Sadoux, 299 F.3d 462, 465 (5th Cir. 2002).

## IV. DISCUSSION

Deutsche Bank makes two arguments that its non-signatory status should not pose a bar to enforcing the arbitration agreement. First, Deutsche Bank

asserts that this case falls within the equitable estoppel principles outlined in Grigson that permit non-signatories to enforce arbitration agreements. Second, Deutsche Bank claims that DBSI's status as an agent for Deutsche Bank permits Deutsche Bank to compel arbitration based on DBSI's agreement with Palmer Ventures. We will address each argument in turn.

## A.    Equitable Estoppel

Deutsche Bank's first argument that it should be able to compel arbitration is one of equitable estoppel, as defined by this court in Grigson. 210 F.3d at 527. Grigson set forth two separate tests under which equitable estoppel may be used by a non-signatory to compel arbitration. Id. "'First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.'" Id. (quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999)) (emphasis omitted). "'Second [and alternatively], application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" Id. (quoting MS Dealer, 177 F.3d at 947) (emphasis omitted). As discussed below, Deutsche Bank contends that it meets both of these tests.

### 1.    General Challenges to the District Court's Decision

Before addressing whether the district court abused its discretion in applying the equitable estoppel tests in Grigson, we consider Deutsche Bank's arguments that the district court used an incorrect legal standard, unsupported by Grigson, to reach its result.

Deutsche Bank first contends that the district court erred by requiring Deutsche Bank to meet the test set out in Bridas, 345 F.3d at 356, rather than the test set out in Grigson in order to compel arbitration. The test set forth in

Bridas concerns whether a signatory can compel arbitration against a non-signatory—the opposite situation presented in this case. Id. The Bridas standard is a different and stricter standard than that used when a non-signatory seeks to compel a signatory to arbitrate.[2] See id. at 360-61. While we agree that an application of the Bridas standard would be erroneous in this case, we do not agree that the district court held Deutsche Bank to the Bridas standard. The district court in this case did cite Bridas at the beginning of its analysis, but it then described and applied Grigson. Indeed, the district court's ultimate conclusion rests on Deutsche Bank's failure to meet the Grigson standard, rather than Bridas. Thus, although the district court's opinion could have been clearer, review of the entire opinion shows that the district court relied on Grigson. Consequently, the district court's inclusion of the Bridas standard in its opinion does not constitute reversible error.

Deutsche Bank also contends that the district court erred in requiring an "express agreement" to arbitrate between Deutsche Bank and Plaintiffs, which is at odds with the equitable estoppel tests set forth in Grigson. In its discussion of Grigson, the district court cited the Bridas court's description of Grigson, which states that "the result in Grigson and similar cases makes sense because the parties resisting arbitration had expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory." Bridas, 345 F.3d at 361 (emphasis added). The district court then noted that Plaintiffs did not "expressly agree" to arbitrate any of the types of claims that they asserted against Deutsche Bank. Deutsche Bank contends the use of "expressly agree" is erroneous.

---

[2] To compel a non-signatory to arbitrate under Bridas, the movant must rely on one of the following theories: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; or (f) third-party beneficiary. Id. at 356.

While it is unclear what type of "express agreement" the district court was looking for, the district court's subsequent analysis shows that it concluded that Plaintiffs' claims against Deutsche Bank are simply too attenuated from any conduct by DBSI to make the equitable estoppel tests found in Grigson applicable. Again, although the district court could have better articulated its reasoning, its use of the phrase "expressly agree" does not indicate that it was holding Deutsche Bank to any higher standard than that mandated by Grigson, especially given the district court's subsequent analysis of the Grigson standard. Therefore, the district court's use of this phrase does not merit reversal, and we now proceed to review the district court's Grigson analysis.

2.    Grigson's First Test

As noted above, the first Grigson test permits a non-signatory to enforce an agreement to compel arbitration through equitable estoppel when the signatory must rely on the terms of the agreement to bring its claim against the non-signatory. Grigson, 210 F.3d at 527. This standard is met when each of the signatory's claims makes reference to or presumes the existence of the agreement. Id. The rationale behind this test is that equity does not permit a signatory to hold a non-signatory liable on the basis of the agreement containing the arbitration clause while denying the effect of the arbitration clause to the non-signatory. Id. at 528.

In this case, our focus is on the Customer's Agreement and the September 15 Representation Letter. As described earlier, the Customer's Agreement mandates arbitration of "all controversies which may arise between [Palmer Ventures and DBSI] concerning any transaction of [sic] construction, performance, or breach of this or any other agreement . . . ." Deutsche Bank argues that this language requires the parties to arbitrate any allegations regarding the September 15 Representation Letter and that the September 15 Representation Letter contains disclaimers which are central to Deutsche Bank's

defense in this case. We must therefore determine whether Plaintiffs "must rely on the terms of the [September 15 Representation Letter] in asserting [their] claims" against Deutsche Bank. See Grigson, 210 F.3d at 527.

Review of Plaintiffs' entire state court petition shows that Plaintiffs are not relying on the September 15 Representation Letter as the source of any of their claims. Instead, most of Plaintiffs' claims are based on prior misrepresentations generally made by KPMG. Plaintiffs' petition does, however, mention the September 15 Representation Letter in two of its 254 paragraphs, which state as follows:

138.

At approximately the same time, KPMG gave Engquist a letter dated September 15, 1999 from Deutsche Bank. In that letter, Deutsche Bank asked Engquist to represent to the bank that "Deutsche Bank has had no involvement in, and accepts no responsibility for the establishment or promotion of the Growth Strategies [BLIPS]."

139.

At the urging of KPMG, Engquist signed the September 15, 1999 letter from Deutsche Bank and made the above representation because Engquist believed it to be true, based upon representations made to him at the time by KPMG and Presidio.

From these paragraphs, it appears that Plaintiffs are attempting to set up a defense should Deutsche Bank argue that the September 15 Representation Letter bars Plaintiffs' claims. Plaintiffs are not, however, relying on the letter in asserting any of their claims against Deutsche Bank.[3]

In reaching its decision, the district court cited Hill v. G.E. Power Systems, Inc., for the conclusion that even if a plaintiff's claims "touch matters" relating

---

[3] Deutsche Bank also contends that Plaintiffs "artfully" pleaded around DBSI by stating that the letter came from Deutsche Bank instead of DBSI. However, as noted above, while the letter is on DBSI letterhead, the text of the letter indicates it may be from Deutsche Bank. This uncertainty prevents us from concluding that Plaintiffs deliberately misrepresented DBSI's role in the September 15 Representation Letter in their petition.

to the arbitration agreement, the claims are not arbitrable unless the plaintiff relies on the agreement to establish its cause of action. 282 F.3d 343, 348-49 (5th Cir. 2002). That principle is equally applicable here. While the September 15 Representation Letter may play a role in the ultimate outcome of this suit, it is not a part of Plaintiffs' causes of action. Again, we return to the concept of equitable estoppel we articulated in Grigson—a signatory to an arbitration agreement cannot "'have it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." Grigson, 210 F.3d at 528. In this case, Plaintiffs are not trying to "have it both ways" because Plaintiffs are not relying on the September 15 Representation Letter to hold Deutsche Bank liable. As a result, equitable estoppel does not permit Deutsche Bank to enforce the arbitration agreement. Consequently, the district court did not abuse its discretion in determining that Deutsche Bank failed to meet the first Grigson test.

3. Grigson's Second Test

The second Grigson test permits a non-signatory to compel arbitration when the signatory "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Id. (internal quotation marks and emphasis omitted). Deutsche Bank suggests this test is not difficult to meet and quotes language from Brown v. Pacific Life Insurance Co., which states that the test is met when the claims against the non-signatory depend "in some part" on the tortious conduct of the signatory. 462 F.3d 384, 398-99 (5th Cir. 2006). Deutsche Bank then concludes that, because Deutsche Bank and DBSI were part of the BLIPS strategy, this test is met. We disagree.

Key to the decision in Brown was the fact that none of the claims against the non-signatories could be considered without analyzing the "tortious acts" of the signatories. Id. In the instant case, although DBSI was involved in the BLIPS strategy by holding Plaintiffs' Investment Account, Deutsche Bank does not explain how Plaintiffs' claims against it necessarily require the court to consider any tortious acts committed by DBSI. Although Deutsche Bank may be understandably reluctant to identify any tortious actions or misconduct by DBSI (its indirect subsidiary), Deutsche Bank must do more than simply conclude that DBSI is intertwined with the facts of this case. As stated in Grigson, the standard is "substantially concerted and interdependent misconduct . . . ." Grigson, 210 F.3d at 527 (internal quotation marks omitted and emphasis modified).

According to Plaintiffs' petition and briefing, DBSI did nothing more than hold the Investment Account, and Plaintiffs do not contend such conduct is tortious in any way. While we do not deny the possibility that DBSI was more involved in the BLIPS strategy than Plaintiffs contend, Deutsche Bank has not shown that to be the case through information about specific individuals at DBSI or specific statements or events that demonstrate DBSI's involvement in the alleged misconduct. Instead, we are left only with the facts that DBSI held Plaintiffs' Investment Account and that DBSI had an unclear role in the September 15 Representation Letter. Therefore, given the lack of information regarding DBSI's role in any alleged misconduct, we cannot say that the district court abused its discretion in concluding that Deutsche Bank failed to meet the second Grigson test.

B.     Agency

Deutsche Bank next contends that it is entitled to enforce the arbitration agreement because DBSI was acting as its agent. In support of this proposition, Deutsche Bank relies on two cases from the Second and Fourth Circuits. See

JLM Indus., Inc. v. Stolt-Nielsen S.A., 387 F.3d 163, 177 (2d Cir. 2004); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988). However, in neither of those cases did the court determine that an agency relationship alone was sufficient to permit a non-signatory to enforce the arbitration agreement. See JLM Indus., 387 F.3d at 177; J.J. Ryan, 863 F.2d at 320-21. Rather, the courts still looked at the connection between the claims, the arbitration agreement, and the parties—an analysis similar to the Grigson tests used in the Fifth Circuit. See JLM Indus., 387 F.3d at 177; J.J. Ryan, 863 F.2d at 320-21.

Fifth Circuit precedent also indicates that an agency relationship alone is insufficient to permit a non-signatory to compel arbitration. In Westmoreland v. Sadoux, we held that "a nonsignatory cannot compel arbitration merely because he is an agent of one of the signatories." 299 F.3d 462, 466 (5th Cir. 2002). Instead, the court in Westmoreland subjected the alleged agent to the Grigson analysis to determine if he could enforce the arbitration agreement. Id. at 467. Thus, even if DBSI is Deutsche Bank's agent, Deutsche Bank must still satisfy the Grigson analysis, which it has failed to do.[4] Therefore, any alleged agency relationship between DBSI and Deutsche Bank is insufficient to overcome Deutsche Bank's inability to establish the elements of equitable estoppel identified in Grigson.

C.     Other Case Law

Throughout its briefing, Deutsche Bank makes much of the fact that many other cases involving Deutsche Bank, DBSI, and similar tax strategies have all reached the conclusion that Deutsche Bank could compel arbitration. However,

---

[4] Although we need not determine whether DBSI was actually Deutsche Bank's agent, we note that the evidence presented thus far is not conclusive. The only evidence identified in support of an agency relationship is the unclear September 15 Representation Letter and the fact that DBSI is an indirect subsidiary of Deutsche Bank, neither of which is dispositve of the issue.

the cases that Deutsche Bank cited are all distinguishable from the instant lawsuit. In many of the cases, the signatory was a party to the lawsuit, and the plaintiff specifically pleaded that the non-signatory and signatories conspired together or that the signatory was guilty of other wrongdoing. See Amato v. KPMG, L.L.P., 433 F. Supp. 2d 460, 485-87 (M.D. Pa. 2006), vacated in part, No. 06CV39, 2006 WL 2376245, at *6 (M.D. Pa. Aug. 14, 2006); Keeter v. KPMG, L.L.P., No. 1:04-CV-3759-WSD, slip op. at 15-17 (N.D. Ga. Sept. 29, 2005); Galtney v. KPMG, L.L.P., No. Civ. H05583, 2005 WL 1214613, at *5 (S.D. Tex. May 19, 2005); Hansen v. KPMG, L.L.P., No. CV-04-10525-GLT, 2005 U.S. Dist. LEXIS 38137, at *10 (C.D. Cal. Mar. 28, 2005). Similarly, in Chew v. KPMG, L.L.P., 407 F. Supp. 2d 790, 799 (S.D. Miss. 2006), the district court permitted Deutsche Bank to compel arbitration based on an agreement between the plaintiff and DB Alex Brown because both Deutsche Bank and DB Alex Brown were parties to the litigation and the plaintiff did not dispute that DB Alex Brown was the agent for Deutsche Bank. Also, in Alfano v. BDO Seidman, L.L.P., 925 A.2d 22, 27-28 (N.J. Super. Ct. App. Div. 2007), the New Jersey Court of Appeals compelled arbitration based on the Customer's Agreement because DBSI actually conducted the trades at issue, and the complaint discussed the acts of the broker. Finally, in Reddam v. KPMG, L.L.P., No. SACV04-1227GLT, 2004 WL 3761875, at *4-6 (C.D. Cal. Dec. 14, 2004), the district court permitted the non-signatories to compel arbitration through DBSI's Customer's Agreement. Although DBSI was not a named defendant, the complaint alleged that DBSI and the defendants were all agents of each other and engaged in interdependent misconduct. Id.

In sum, although the instant lawsuit may go against the prevailing trend, it is with good reason. Unlike the above-referenced cases, there are no specific allegations by any party in this case that DBSI had any role in the BLIPS strategy other than to be the home for the Investment Account. Again, while the

facts may ultimately show that DBSI had a greater role than currently described, Deutsche Bank did not meet its burden of demonstrating DBSI's involvement in the alleged misconduct. Consequently, this case is different than those relied upon by Deutsche Bank, and the district court did not abuse its discretion in determining that Deutsche Bank could not compel arbitration.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court and return this case to the district court for further proceedings consistent with this opinion.