[No. B195740. Second Dist., Div. Eight. Apr. 22, 2009.]

STEVEN J. GOLDMAN et al., Plaintiffs and Respondents, v.
KPMG, LLP, et al., Defendants and Appellants.
JEFFREY R. HAINES et al., Plaintiffs and Respondents, v.
KPMG, LLP, et al., Defendants and Appellants.

212

## Counsel

Gibson, Dunn & Crutcher, James P. Clark, Cheryl D. Justice, Matthew D. Taggart, Matthew C. Wickersham and Michael Anthony Brown for Defendant and Appellant KPMG, LLP.

Munger, Tolles & Olson, Brad D. Brian, Richard E. Drooyan, Gregory J. Weingart, Allison B. Stein and Joseph J. Ybarra for Defendant and Appellant Sidley Austin LLP.

Green, Broillet & Wheeler, Bruce Broillet, Scott H. Carr; Stone, Rosenblatt, Cha, Ira H. Rosenblatt; Esner Chang & Ellis, Stuart B. Esner, Gregory R. Ellis, Holly N. Boyer; Eagan O'Malley & Avenatti and Michael Avenatti for Plaintiffs and Respondents.

## Opinion

**RUBIN, Acting P. J.—**

### SUMMARY

The plaintiffs in two lawsuits, consolidated on appeal, seek millions of dollars in damages in connection with allegedly fraudulent tax shelter schemes developed, marketed and implemented by their former accountants, lawyers and investment advisers. In one of the tax shelter schemes, a step in the process included the formation of limited liability companies in which plaintiffs and their investment advisers became members. The limited liability companies had standard operating agreements containing broad arbitration clauses. When plaintiffs sued the accountants, lawyers and investment advisers, the accountants and lawyers, who were not parties to the operating agreements, sought an order compelling arbitration. Relying on the doctrine of equitable estoppel, they argued that plaintiffs, as signatories to an arbitration agreement with the investment advisors, should be equitably estopped from asserting the right they otherwise would have had to pursue their claims against the accountants and lawyers in court.

The trial court in each case denied the motions to compel arbitration (in one case, in part only), and the accountants and lawyers appealed. We conclude the doctrine of equitable estoppel has no application in these cases. The sine qua non for allowing a nonsignatory to enforce an arbitration clause based on equitable estoppel is that the claims the plaintiff asserts against the

nonsignatory are dependent on or inextricably bound up with the contractual obligations of the agreement containing the arbitration clause. Because the contractual obligations in the operating agreements were unrelated to plaintiffs' claims against the nonsignatory accountants and lawyers, there is no basis in equity for preventing plaintiffs from suing the accountants and lawyers in court. Accordingly, we affirm the orders of the trial court denying the motions to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

In the 1990's and continuing into the next decade, KPMG, LLP, a major accounting firm, assisted high net worth individuals to evade federal income taxes on billions of dollars in capital gains and ordinary income by developing, promoting and implementing fraudulent tax shelters. KPMG entered into a deferred prosecution agreement with the United States Department of Justice in August 2005, admitting to its conduct and agreeing to pay $456 million in fines, restitution to the IRS and penalties.[1] These appeals involve different versions of similar tax shelters.

### A.  *The complaints.*

In September 2005, several months after being informed of the then pending criminal probe into fraudulent tax shelters, respondents Steven J. Goldman, his wife, and a limited liability company of which Goldman was the sole member (collectively, Goldman) sued KPMG, Sidley Austin Brown & Wood LLP (now Sidley Austin LLP (Sidley)), and others.[2] The others included The Diversified Group, Incorporated (DGI), a registered investment advisor; DGI's principal, James Haber; and Alpha Consultants, LLC (Alpha). (Unless the context shows otherwise, further references to "DGI" include DGI, Haber and Alpha, collectively.) Goldman sought to recover millions of dollars he ultimately paid to the government in taxes and interest as a result of disallowed deductions claimed in connection with investments in the tax shelters marketed by KPMG.

Goldman's complaint, so far untested, alleged the following.

Goldman engaged KPMG to provide tax planning and tax strategy advice. In the 1990's, KPMG created "Son of Boss" investment schemes, which were generic tax avoidance products it marketed to clients with significant taxable

---

[1] A former partner at Brown & Wood (a predecessor of Sidley Austin LLP) was indicted by a federal grand jury for fraud in connection with the firm's participation in the tax shelter schemes.

[2] We refer throughout to Sidley; the allegations of the complaint sometimes refer to one of its predecessor firms, Brown & Wood, the alleged participant in the tax shelter schemes.

income. KPMG, Sidley and promoters such as DGI induced Goldman and hundreds of others to invest millions of dollars in Son of Boss investments. A KPMG partner pitched a Son of Boss investment (the Plan) to Goldman, telling him that in exchange for payments of about $2.1 million, Goldman would generate a tax loss of as much as $61 million in about 60 days. The Plan involved buying options and related instruments on the foreign currency market, and would be handled by DGI, which would prepare the necessary legal documents and arrange for the formation of a limited liability company to generate the tax loss. KPMG and Sidley each would independently provide Goldman an opinion letter stating it was "more likely than not" that a deduction taken for losses generated by the Plan investment would be upheld if challenged in court by the Internal Revenue Service. Defendants knew but did not disclose to Goldman that several KPMG tax partners had repeatedly warned KPMG management that the IRS would likely succeed in challenging any deductions generated by the Plan.

Relying on the representations from KPMG and Sidley, Goldman decided to invest in the Plan in 2000. KPMG introduced Goldman to Haber of DGI; Haber then formed AD Managed Equity Fund LLC (AD Managed Fund) as the limited liability company through which Goldman would make the investment, with DGI and Alpha as the founding and comanaging members. Goldman purchased four options involving the NASDAQ 100 Index at a cost of $1.2 million, and contributed the four options to AD Managed Fund as his capital investment in AD Managed Fund. DGI charged Goldman $2.1 million in fees for arranging the transaction, including a $600,000 advisory fee remitted to KPMG. A month or so later, Goldman withdrew from AD Managed Fund, pursuant to prior directions of KPMG and DGI, understanding that as a result, he would incur a tax loss of about $61 million. Sidley provided Goldman with a lengthy opinion letter, as promised, and "pursuant to a prior conspiracy" between KPMG, DGI and Sidley, KPMG paid or caused DGI to pay Sidley a fee in excess of $300,000 for providing the opinion letter. Sidley did not independently research or analyze whether the Plan would withstand a legal challenge, but merely attached its signature to a form opinion letter drafted by KPMG. Goldman claimed a tax deduction for the losses generated by AD Managed Fund on his 2000 federal and state tax returns. In November 2004, Goldman agreed to pay the State of California and the federal government tens of millions of dollars in taxes and interest as a result of the deductions claimed for losses generated by the investment in AD Managed Fund.

Goldman's complaint asserted claims of breach of fiduciary duty, fraud, fraudulent nondisclosure, negligent misrepresentation, and negligent nondisclosure against KPMG and Sidley (as well as professional negligence against

KPMG). In addition, Goldman alleged causes of action for conspiracy to commit fraud against KPMG, Sidley and DGI, and for aiding and abetting fraud and aiding and abetting breach of fiduciary duty against Sidley and DGI. Goldman alleged DGI conspired with KPMG and Sidley "to fraudulently induce [Goldman] to invest in AD Managed." In sum, KPMG would locate likely investors, assuring them the transaction would more likely than not withstand an IRS challenge; DGI would act as the investment advisor "to structure and document the Son of Boss scheme"; DGI "would form the limited partnership required for the transaction"; Sidley "would assist KPMG in securing investors" by providing an opinion letter; and the fees received would be divided between KPMG, Sidley and DGI.

Respondents Jeffrey R. Haines and his wife (collectively, Haines) filed a lawsuit, also in September 2005, against KPMG, Sidley and DGI, alleging substantially the same facts and causes of action as the Goldman complaint. Haines was induced to invest in another variation of the Son of Boss tax shelter, and was told by KPMG that in exchange for payments of approximately $1.0 million, Haines would generate a tax loss of approximately $16 million in about 60 days. The players and the scenario were the same as in the Goldman transaction, except that the limited liability company through which Haines would make his investment was called the AD FX Investment Fund LLC (AD FX Fund).

Both Goldman and Haines sought damages of not less than $10 million, plus punitive damages.

### B. *The motions to compel arbitration.*

In both the Goldman and Haines cases, KPMG and Sidley filed motions to compel arbitration. Neither had arbitration agreements with any of the plaintiffs. However, the limited liability companies through which the Goldman/Haines tax losses were generated—AD Managed Fund and AD FX Fund, respectively—each had standard operating agreements containing broad arbitration clauses, and Goldman and Haines signed those operating agreements to become members of the funds. Consequently, Goldman and Haines agreed to arbitrate any disputes with DGI and Alpha "arising out of or relating to" the operating agreements. KPMG and Sidley were not parties to those agreements, but argued Goldman and Haines were equitably estopped from avoiding arbitration of their claims against KPMG and Sidley. The doctrine of equitable estoppel applied, they claimed, in either of two circumstances, both of which were asserted to exist in their cases: (1) when plaintiffs' claims rely upon or are intimately founded in and intertwined with an agreement to arbitrate, or (2) where the signatories raise allegations of

substantially interdependent and concerted misconduct by both nonsignatories (KPMG and Sidley) and one or more signatories (DGI and Alpha).

In the Goldman case, the trial court (Judge Susan Bryant-Deason) denied both motions. As to KPMG, the court found Goldman and KPMG had several written engagement letters, none of which contained an arbitration clause, and that KPMG was not entitled to invoke equitable estoppel to supersede a written express agreement containing no arbitration clause. Sidley's motion was denied because of the possibility of conflicting rulings on common issues if arbitration were to take place only between Goldman and Sidley.

In the Haines case, the trial court (Judge Paul Gutman) granted the motions in part and denied them in part. The court granted the motions to compel arbitration of the conspiracy and aiding and abetting causes of action. The other causes of action, the court found, "sound . . . in common law tort duties and the specific duties which arise from the separate professional relationships between KPMG and [Haines] and Sidley Austin and [Haines]" and should be litigated, as the conduct alleged "is unconnected to the arbitration agreement in any necessary sense." The court stayed the latter causes of action, pending the outcome of the arbitration of the conspiracy and aiding and abetting claims.

KPMG and Sidley filed timely appeals, which were consolidated for purposes of briefing, oral argument and decision.[3]

## DISCUSSION

We begin with our conclusion, which is this: the sine qua non for application of equitable estoppel as the basis for allowing a nonsignatory to enforce an arbitration clause is that the claims plaintiff asserts against the

---

[3] There are two requests for judicial notice. First, Sidley has requested judicial notice of a declaration filed in the trial court in the Haines case in support of Sidley's motion to compel arbitration. The declaration, by one of Sidley's attorneys, includes copies of (1) a letter from DGI's lawyer, stating DGI would move to compel arbitration in New York unless Haines dismissed DGI from the case, and (2) Haines's request for dismissal of DGI and Haber without prejudice. We grant the request, although we note it is undisputed that the presence or absence of DGI and Haber as defendants has no bearing on the applicability *vel non* of the doctrine of equitable estoppel. (See *Roberson v. Money Tree of Alabama, Inc.* (M.D.Ala. 1997) 954 F.Supp. 1519, 1529 (*Roberson*).)

Second, KPMG requests judicial notice of (1) an order of nolle prosequi, entered in connection with its deferred prosecution agreement with the Department of Justice, and (2) KPMG's answers to the Goldman and Haines complaints. KPMG asserts these documents are relevant to refute false statements in the Goldman/Haines reply brief that (a) KPMG was "criminally prosecut[ed]" by way of the deferred prosecution agreement, and (b) KPMG admitted having unclean hands in connection with the tax shelter activities relating to these cases. Since neither point is relevant to our analysis of this case, this request for judicial notice is denied.

nonsignatory must be dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause. In this case, the Goldman/Haines claims against KPMG and Sidley are unrelated to any of the obligations in the operating agreements, which were merely a procedural and collateral step in the creation of the fraudulent tax shelters. The complaints do not rely on or use any terms or obligations of the operating agreements as a foundation for their claims; indeed, the operating agreements are not even mentioned in the complaints. Consequently, as we shall see, the rationale for requiring parties to arbitrate, despite the fact they have not agreed to do so, is entirely absent.

We first summarize KPMG and Sidley's contentions with respect to the proper application of equitable estoppel, and why their formulation is incorrect. We then describe the general legal principles in play, the rationale underlying the application of equitable estoppel, the precedents informing our conclusion as to the proper standards for application of the doctrine, and the specific application of those standards to the circumstances of these cases.

### A. *The KPMG/Sidley contentions and the proper standard.*

KPMG and Sidley argue, as they did to the trial courts, that the law of equitable estoppel requires arbitration under either of two circumstances: (1) when a signatory's (Goldman/Haines) claim against a nonsignatory (KPMG/Sidley) "makes reference to or presumes the existence of" an agreement containing an arbitration clause, or (2) when a signatory alleges interdependent and concerted misconduct by signatories and nonsignatories. While this formulation uses terms that appear in cases discussing equitable estoppel, those cases show that the KPMG/Sidley formulation is incomplete as to both circumstances:

■ — As to the first circumstance, merely "mak[ing] reference to" an agreement with an arbitration clause is not enough. Equitable estoppel applies "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." (*MS Dealer Service Corp. v. Franklin* (11th Cir. 1999) 177 F.3d 942, 947 (*MS Dealer*).) The difference between "reference," the word chosen by KPMG/Sidley, and "reliance," as employed by *MS Dealer* and others, is significant.

— As to the second circumstance, while the cases recite the language which KPMG and Sidley proffer (interdependent and concerted misconduct by signatories and nonsignatories), the cases also show that this language

subsumes an overarching element critical to the proper application of equitable estoppel. In *any* case applying equitable estoppel to compel arbitration despite the lack of an agreement to arbitrate, a nonsignatory may compel arbitration only when the claims against the nonsignatory are founded in and inextricably bound up with *the obligations imposed by the agreement containing the arbitration clause*. In other words, allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement.[4]

Both points become clear on a review of the precedents, including the cases that recite the two circumstances without expressly stating, as to the second, that the allegations of interdependent and concerted misconduct must be founded in or intertwined with the obligations in the underlying agreement. Indeed, some more recent cases have expressly stated that substantially interdependent and concerted misconduct is not, by itself, sufficient for the application of equitable estoppel. We turn to those precedents after describing the relevant arbitration principles and the rationale for equitable estoppel.

B.   *General arbitration principles.*

██   Because the agreements relied upon to compel arbitration in this case evidence transactions involving commerce, as defined in the Federal Arbitration Act (9 U.S.C. § 1 et seq.), federal law governs the interpretation of the agreements. (*Turtle Ridge Media Group, Inc. v. Pacific Bell Directory* (2006) 140 Cal.App.4th 828, 832 [44 Cal.Rptr.3d 817] (*Turtle Ridge*).) Accordingly, decisions of the lower federal courts, while not binding, are persuasive authority. (*Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 268 [25 Cal.Rptr.3d 440] (*Boucher*).) As a general matter, one cannot be required to submit a dispute to arbitration unless one has agreed to do so. Under governing federal law, however, it is well established that, despite the general requirement of an agreement to arbitrate, a nonsignatory to an arbitration clause may, in certain circumstances, compel a signatory to arbitrate, based on ordinary contract and agency principles. (Cf. *Comer v. Micor, Inc.* (9th Cir. 2006) 436 F.3d 1098, 1101 [nonsignatories of arbitration agreements may be bound by the agreement " 'under ordinary contract and

---

[4] Cf. *JLM Industries, Inc. v. Stolt-Nielsen SA* (2d Cir. 2004) 387 F.3d 163, 178, fn. 7 ("We do not . . . mean to suggest that a claim against a co-conspirator of a party alleged to have engaged in antitrust violations will always be intertwined to a degree sufficient to work an estoppel. The inquiry remains a fact-specific one"); *Denney v. Jenkens & Gilchrist* (S.D.N.Y. 2005) 412 F.Supp.2d 293, 297–298 (claims against coconspirator of a party entitled to compel arbitration are not always intertwined sufficiently for estoppel purposes; court must determine whether claims were intimately founded in or intertwined with the underlying obligations of the agreements with the arbitration clause).

agency principles,' " among which are incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel]; *Boucher, supra*, 127 Cal.App.4th at p. 268 [citing the five theories under which an arbitration clause can be enforced by or against a nonsignatory].) In such cases, where the question is whether a particular party is bound by the arbitration agreement, the liberal federal policy favoring arbitration agreements, which is "best understood as concerning 'the scope of arbitrable issues,' [citation]," is inapposite. (*Comer v. Micor, Inc., supra*, 436 F.3d at p. 1104, fn. 11; see *Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 626 [87 L.Ed.2d 444, 105 S.Ct. 3346] ["as a matter of federal law, any doubts concerning *the scope of arbitrable issues* should be resolved in favor of arbitration" (italics added)].)

### C. *The rationale for applying equitable estoppel.*

█   This case involves only one of the five theories under which an arbitration clause can be enforced by a nonsignatory: equitable estoppel. The rationale for permitting a nonsignatory to enforce an arbitration agreement—that is, compelling arbitration between parties who have not agreed to arbitrate—on equitable estoppel grounds has been enunciated in many cases. Equitable estoppel generically " 'precludes a party from asserting rights "he otherwise would have had against another" when his own conduct renders assertion of those rights contrary to equity.' "[5] (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1713 [1 Cal.Rptr.3d 328] (*Metalclad*), quoting *International Paper, supra*, 206 F.3d at pp. 417–418.)

So, if a plaintiff relies on the terms of an agreement to assert his or her claims against a nonsignatory defendant, the plaintiff may be equitably estopped from repudiating the arbitration clause of that very agreement. In other words, a signatory to an agreement with an arbitration clause cannot " 'have it both ways' "; the signatory "cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." (*Grigson v. Creative Artists Agency* (5th Cir. 2000) 210 F.3d 524, 528 (*Grigson*).) As *Grigson* sums it up, "[t]he linchpin for equitable estoppel is equity—fairness." (*Ibid.*)

---

[5] In the context of compelling a nonsignatory to arbitrate a dispute, *International Paper* observed: "In the arbitration context, the doctrine [of equitable estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when [the party] has consistently maintained that other provisions of the same contract should be enforced to benefit him." (*Inter. Paper v. Schwabedissen Maschinen & Anlagen* (4th Cir. 2000) 206 F.3d 411, 418 (*International Paper*).)

In short, and couched in terms of this case, Goldman and Haines may be estopped from asserting the rights they otherwise would have to sue KPMG and Sidley in court only if " '[their] own conduct renders assertion of those rights contrary to equity.' " (*Metalclad, supra*, 109 Cal.App.4th at p. 1713.) Thus, it would be inequitable for Goldman and Haines, as parties to arbitration agreements with DGI and Alpha, to use the substantive terms of those agreements as a foundation for their claims against nonsignatories KPMG and Sidley, and at the same time to disavow the arbitration clauses of those very agreements. But, if their claims against KPMG and Sidley are asserted without reliance on any obligations imposed by the operating agreements with DGI and Alpha, they have engaged in no conduct that is "contrary to equity," and there is no basis in equity for requiring them to arbitrate with parties with whom they have no arbitration agreement.

### D. *The precedents on equitable estoppel.*

The early cases applying equitable estoppel to permit a nonsignatory to enforce an arbitration agreement demonstrate that the essence of the doctrine requires the plaintiff's claims against the nonsignatory to rely on, or be founded in and inextricably bound up with, the terms or duties of the agreement containing the arbitration clause. As *Metalclad* observes, courts applying equitable estoppel against a signatory "have 'looked to the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were " ' "intimately founded in and intertwined with the underlying contract obligations." ' " ' [Citation.]"[6] (*Metalclad, supra*, 109 Cal.App.4th at p. 1713.) This requirement comports with, and indeed derives from, the very purposes of the doctrine: to prevent a party from using the terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement. The cases upon which KPMG and Sidley rely, properly analyzed, are entirely consonant with our view of the core of the equitable estoppel doctrine.

### 1. *MS Dealer.*

The earliest of the principal cases upon which KPMG and Sidley rely—and the case KPMG describes as "[t]he seminal opinion on the issue of interdependent misconduct"—is *MS Dealer, supra*, 177 F.3d 942. So, we begin there, noting also the antecedent cases on which *MS Dealer* relies.

---

[6] See also *Roberson, supra*, 954 F.Supp. at page 1529 ("A party to an agreement should be equitably estopped from suing a nonsignatory in court when the very basis of the party's claim against the nonsignatory is that the nonsignatory breached the duties and responsibilities assigned to it by the party's agreement with the other signatory party, which agreement was governed by an arbitration clause").

In *MS Dealer*, the purchaser of a vehicle (Franklin) sued the seller, the seller's assignee, and MS Dealer (the company which provided a service contract for the car). Franklin had a contract (the "buyers order") with the seller, containing an arbitration clause covering all disputes between them in connection with the purchase of the car. The buyers order incorporated by reference a retail installment contract, in which Franklin was charged $990 for a service contract through MS Dealer. MS Dealer was not a signatory to either the buyers order or the retail installment contract. When Franklin discovered defects in the car, she sued, asserting breach of contract, breach of warranty, fraud and conspiracy claims. (*MS Dealer, supra*, 177 F.3d at pp. 944–945.) All her claims against MS Dealer "[arose] out of the $990.00 charge identified in the Retail Installment Contract for the service contract." (*Id.* at p. 945.) Franklin's complaint alleged MS Dealer colluded with the seller and the assignee in a scheme to defraud her in connection with the purchase of the service contract; the $990 charge was excessive and the defendants conspired to charge it so they could each profit from the sale of the service contract by dividing up the excess amount, and the excessive charge required her to borrow an inflated amount of money to purchase the car and to incur excessive interest on her car loan.

The trial court denied MS Dealer's petition to compel arbitration, but the Eleventh Circuit concluded that Franklin was equitably estopped from avoiding arbitration with MS Dealer. (*MS Dealer, supra*, 177 F.3d at p. 948.) The court observed that existing case law showed equitable estoppel allowed a nonsignatory to compel arbitration "in two different circumstances." (*Id.* at p. 947.) The two different circumstances the court articulated were: when the signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory, and when the signatory raises allegations of substantially interdependent and concerted misconduct by the nonsignatory and a signatory.[7] *MS Dealer* concluded that both of the circumstances giving rise to equitable estoppel applied:

— First, each of Franklin's claims against MS Dealer "makes reference to and presumes the existence of the $990.00 charge contained in the Retail Installment Contract, which was incorporated by reference into the Buyers

---

[7] The court said: "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory. [Citation.] When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[] out of and relate[] directly to the [written] agreement,' and arbitration is appropriate. [Citation.] Second, 'application of equitable estoppel is warranted . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.' [Citation.]" (*MS Dealer, supra*, 177 F.3d at p. 947.)

Order," and "each of [Franklin's] fraud and conspiracy claims depends entirely upon her contractual obligation to pay $990.00 for the service contract." (*MS Dealer, supra,* 177 F.3d at pp. 947–948, fn. omitted.)

— Second, the court observed, it was clear that Franklin's claims against the seller and MS Dealer were based on the same facts and were inherently inseparable; she alleged MS Dealer conspired with the seller and its assignee (also not a signatory) to defraud her by charging excessive amounts for the service contract. Significantly: "It is important to note that Franklin's obligation to pay the $990.00 charge arose under the Buyers Order and that she specifically alleges that MS Dealer worked hand-in-hand with [the seller] and [its assignee] in this alleged fraudulent scheme. *Her 'allegations of such pre-arranged, collusive behavior establish[] that [her] claims against [MS Dealer are] intimately founded in and intertwined with the obligations imposed by the [Buyers Order].'* [Citations.]" (*MS Dealer, supra,* 177 F.3d at p. 948, italics added.)

In short, *MS Dealer* itself—both in its facts and in the court's analysis—establishes, contrary to the contentions of KPMG and Sidley, that mere allegations of collusive behavior between signatories and nonsignatories to a contract are not enough to compel arbitration between parties who have not agreed to arbitrate: those allegations of collusive behavior must also establish that the plaintiff's claims against the nonsignatory are " 'intimately founded in and intertwined with the obligations imposed by the [contract containing the arbitration clause].' " (*MS Dealer, supra,* 177 F.3d at p. 948.) It is the relationship of the *claims,* not merely the collusive behavior of the signatory and nonsignatory parties, that is key.

█ The cases upon which *MS Dealer* relied make the same point. *MS Dealer* cites two cases relevant to applying equitable estoppel based on the second circumstance (substantially interdependent and concerted misconduct): *Boyd v. Homes of Legend, Inc.* (M.D.Ala. 1997) 981 F.Supp. 1423 (*Boyd*) and *Roberson, supra,* 954 F.Supp. 1519. These cases (decided by the same court) confirm that equitable estoppel applies when collusive behavior between signatories and nonsignatories is alleged, but only where the plaintiff's claims are intertwined with the obligations imposed by the contract with the arbitration clause. Thus:

— In *Boyd,* the district court explained there are two factual scenarios under which a court can find that the claims against a nonsignatory are "intimately founded in and intertwined with the underlying contractual obligations . . . ." (*Boyd, supra,* 981 F.Supp. at p. 1432.) The first occurs when "adjudication of the disputes between the signatory and nonsignatory parties would require interpretation, and probably enforcement, of the specific

terms and conditions of the underlying contract" (*id.* at p. 1433)—in other words, when the plaintiffs " 'must rely on the terms of the written agreement in asserting their claims.' " (*Ibid.*) The second factual scenario warranting equitable estoppel occurs when the signatory raises allegations of "not merely parallel or similar, but substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." (*Ibid.*) The second factual scenario arose in two cases (again decided by the same court) in which the court concluded "that the plaintiffs' allegations of such pre-arranged, collusive behavior established that their claims against the [nonsignatory] insurers *were intimately founded in and intertwined with the obligations imposed by the underlying loan agreements.*" (*Ibid.*, italics added, citing *Staples v. The Money Tree, Inc.* (M.D.Ala. 1996) 936 F.Supp. 856, 859, and *Roberson, supra,* 954 F.Supp. at p. 1529.) The *Boyd* court found the second factual scenario justifying equitable estoppel did not apply in *Boyd*, observing that the plaintiffs merely alleged similar, not joint, conduct, and concluding "none of the plaintiffs' claims against [the nonsignatory manufacturer] are inextricably bound up with the terms and duties of the contracts the plaintiffs have signed with their [signatory] dealers." (*Boyd, supra,* 981 F.Supp. at p. 1434.)

■ —— In *Roberson*, the district court applied equitable estoppel to compel arbitration, at the instance of an insurer who was not a party to a loan agreement which contained an arbitration clause. Plaintiffs alleged that the signatory lender and nonsignatory insurer conspired to defraud them, by suppressing information and misrepresenting to plaintiffs that they could not qualify for loans unless they purchased expensive insurance. (*Roberson, supra,* 954 F.Supp. at p. 1522.) The court concluded that "at least some of the claims against defendants were closely intertwined and arose in connection with the loan agreement itself"; the allegations that a scheme to load unnecessary insurance policies onto high-interest consumer loan agreements "[gave] rise to a set of complaints about their contract obligations that implicate all defendants inseparably." (*Id.* at p. 1529.) Notably, the court expressly stated: "Admittedly, to warrant equitable estoppel, it is not enough that the plaintiff be in a position to raise similar and parallel claims against both the other party to the contract and the third party. Therefore, it is irrelevant whether or not claims are indeed raised against both parties. *What is necessary is that the claim against the nonsignatory be inextricably bound up with the terms and duties of the contract the plaintiff has signed with the other defendant.*" (*Ibid.*, italics added.) As we shall see (pt. E., *post*), it is this necessary element that is entirely missing from the Goldman/Haines claims against KPMG and Sidley.

## 2. *Other precedents.*

None of the other cases on which KPMG and Sidley rely supports any conclusion other than the one we have reached: allegations of interdependent and concerted misconduct by signatories and nonsignatories will justify allowing a nonsignatory to enforce an arbitration clause only, as the *Roberson* court put it, when the claims against the nonsignatory are "inextricably bound up with the terms and duties of the contract the plaintiff has signed with the other defendant." (*Roberson, supra*, 954 F.Supp. at p. 1529; see *MS Dealer, supra*, 177 F.3d at p. 948.) A few examples will suffice.[8]

### a. *Grigson.*

Sidley relies on *Grigson, supra*, 210 F.3d 524, which quotes *MS Dealer's* observation that equitable estoppel applies "in two different circumstances." (*MS Dealer, supra*, 177 F.3d at p. 947.) But *Grigson* is not helpful to Sidley because *Grigson* expressly states that the Fifth Circuit "agree[s] with the intertwined-claims test formulated by the Eleventh Circuit [in *MS Dealer*]." (*Grigson, supra*, 210 F.3d at p. 527.) That formulation, as we have just seen, requires either the plaintiff's reliance on the terms of the written agreement or, where allegations of substantially interdependent and concerted misconduct are raised, that the plaintiff's claims be " 'intimately founded in and intertwined with *the obligations imposed by the [agreement containing the arbitration clause].*' " (*MS Dealer, supra*, 177 F.3d at p. 948, italics added.) *Grigson* goes on to say that equitable estoppel is "much more readily applicable when the case presents *both* independent bases advanced by the Eleventh Circuit for applying the intertwined-claims doctrine." (*Grigson, supra*, 210 F.3d at pp. 527–528, italics added.) In *Grigson*, the court found both bases were present—and the facts in *Grigson* again clearly show the plaintiff's allegations of interdependent and concerted misconduct were inextricably bound up with the terms and obligations of the agreement with the arbitration clause.

In *Grigson*, the court found it appropriate to apply equitable estoppel to compel arbitration "for an action centered on tortious interference with a contract with an arbitration clause, brought by signatories to the contract against non-signatories, . . . because [the] action [was] intertwined with, and dependent upon, that contract . . . ." (*Grigson, supra*, 210 F.3d at p. 525.) The court found the district court "did *not* abuse its discretion by concluding 'that

---

[8] In addition to the cases discussed in the text, *post*, KPMG and Sidley cite several trial court decisions in other lawsuits against them, involving other tax shelter schemes and other parties, in which motions to compel arbitration were granted. (E.g., *Chew v. KPMG, LLP* (S.D.Miss. 2006) 407 F.Supp.2d 790.) Most of these cases contain little analysis, and none adds anything to, or detracts from, the analysis in the text.

Plaintiffs' claims are so intertwined with and dependent upon the Distribution Agreement that the arbitration agreement within the Distribution Agreement should be given effect'."[9] (210 F.3d at pp. 528–529.) The court proceeded to "compar[e] the complaint . . . with the distribution agreement" (*id.* at p. 529), describing several examples of allegations and claims that were "intertwined with, and dependent upon, the distribution agreement" (*ibid.*), and concluding those were "but a few examples of the intertwining of the claims with the distribution agreement, including the claimed concerted actions by Defendants (non-signatories), with TriStar, a signatory." (*Id.* at p. 530.) Indeed, the court pointed out that the plaintiffs had first sued the signatory to the distribution agreement for breach of contract and, when the signatory sought to enforce the arbitration clause, dismissed that action and sued nonsignatories for tortious interference with the distribution agreement (*id.* at pp. 526, 530)—conduct the court described as "a quite obvious, if not blatant, attempt to bypass the agreement's arbitration clause." (*Id.* at p. 530.) Both lawsuits, the court observed, "turn[ed] on the meaning of the distribution agreement's numerous—often intricate—provisions, which are unique to the film industry, and on [the signatory's] conduct in relation to that agreement." (*Ibid.*) The court concluded that the equitable estoppel doctrine was "crafted for such situations," and "[t]he claims are intertwined with, and dependent upon, the distribution agreement, including, but *not* limited to, Defendants (non-signatories) and TriStar (non-defendant signatory) being charged with interdependent and concerted misconduct." This, the court observed, was "the quintessential situation for when the doctrine [of equitable estoppel] should be applied."[10] (*Id.* at p. 531.)

### b. *Metalclad.*

KPMG and Sidley also rely on *Metalclad, supra,* 109 Cal.App.4th 1705, but again, the case does not support the proposition that allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, can justify the application of equitable estop-

---

[9] Some courts have applied an abuse of discretion standard in determining whether a trial court properly applied equitable estoppel to compel arbitration. (E.g., *Grigson, supra,* 210 F.3d at p. 528; *Brown v. Pacific Life Ins. Co.* (5th Cir. 2006) 462 F.3d 384, 398 (*Brown*); but see *MS Dealer, supra,* 177 F.3d at p. 946 [de novo review of district court's decision denying petition to compel arbitration on ground MS Dealer was not a signatory to the arbitration agreement].) In California, absent conflicting evidence, we review the issue de novo (*Boucher, supra,* 127 Cal.App.4th at p. 267), as the question is whether the undisputed facts constitute a sufficient legal basis for the application of equitable estoppel.

[10] Claims of tortious interference with contract are particularly well suited for imposing equitable estoppel against the signatory: But for the contract containing the arbitration clause, there would be no breach and no claim for interference with the contract.

pel to compel arbitration between parties who have not agreed to arbitrate. In *Metalclad*, the plaintiff (Metalclad) had a written stock purchase agreement, including an arbitration clause, with Geologic, a subsidiary of defendant Ventana. Metalclad sued Ventana, Geologic and others for breach of contract, fraud and other claims, later dropping Geologic from the suit. Ventana sought to compel arbitration under its subsidiary's (Geologic's) contract, contending Metalclad should be equitably estopped from raising Ventana's nonsignatory status. (*Metalclad, supra*, 109 Cal.App.4th at pp. 1708–1710.) The court agreed, observing that:

— Equitable estoppel applies "when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are ' "based on the same facts and are inherently inseparable" ' from arbitrable claims against signatory defendants." (*Metalclad, supra*, 109 Cal.App.4th at p. 1713.)

— Courts applying equitable estoppel against a signatory have " 'looked to . . . in particular whether the claims that the nonsignatory sought to arbitrate were " ' "intimately founded in and intertwined with the underlying contract obligations." ' " ' "[11] (*Metalclad, supra*, 109 Cal.App.4th at p. 1713.) Concluding they were, the court pointed to the "nexus . . . between Metalclad's claims against Ventana and the underlying contract with Geologic, as well as the integral relationship between . . . Geologic and Ventana . . . ." The court pointed out that Metalclad claimed Ventana caused Geologic to breach the underlying contract, and concluded Metalclad was "in effect, seek[ing] the benefit of that contract in the form of damages from Ventana while avoiding its arbitration provision." (*Id.* at p. 1717.) Metalclad's tort claims against Ventana were "similarly 'intimately founded in and intertwined with' the underlying Geologic contract," and estoppel "prevents Metalclad from avoiding arbitration by suing only the parent corporation in these circumstances." (*Id.* at pp. 1717–1718.)

— Further, the court cited *MS Dealer*'s conclusion that allegations of prearranged, collusive behavior established that the claims against the nonsignatory were " ' "intimately founded in and intertwined with the obligations imposed by the [agreement with the arbitration clause]" ' " (*Metalclad, supra*, 109 Cal.App.4th at p. 1718), and concluded that Metalclad's allegations that a signatory and a nonsignatory colluded to acquire a third entity by a

---

[11] See also *Boucher, supra*, 127 Cal.App.4th 262, 271 ("under both federal and California decisional authority, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations").

fraudulent contract cannot help but be " 'intimately founded in and intertwined with' that contract." (*Ibid.*) In short, *Metalclad*, like *MS Dealer* and *Grigson*, in no way suggests that allegations of collusive behavior by signatories and nonsignatories, with no relationship to the terms of the underlying contract, can justify application of equitable estoppel to compel arbitration.

### c. *Brown.*

In its reply brief, Sidley cites *Brown, supra,* 462 F.3d 384, where the court found the district court did not abuse its discretion (although the point was "close") in determining that signatories to an arbitration agreement were estopped, "under *Grigson*'s second prong," from asserting that the lack of an arbitration agreement precluded arbitration. (462 F.3d at p. 398.) But in *Brown*, the plaintiffs sued all the defendants in connection with investment decisions of a broker handling the plaintiffs' account under a client agreement with an arbitration clause. (*Id.* at p. 389.) The district court found "there was no way to bring actions against [two nonsignatories] without considering the actions of [the signatory to the contract and its representative]," and the court found that conclusion was not "patently incorrect." (*Id.* at p. 398.) This was because "[w]hether and how [the nonsignatories] defrauded or breached duties owed to the [plaintiffs]" depended in some part on the nature of tortious acts allegedly committed by the signatory and its representative, and the plaintiffs failed to allege any tortious acts by the nonsignatories that were "separate and apart" from those of the signatory's representative, whose acts were covered by the arbitration clause of the brokerage agreement. (*Brown, supra,* 462 F.3d at pp. 398–399.) Here, by contrast, Goldman and Haines could certainly bring actions against KPMG and Sidley without depending on the nature of the tortious acts of DGI; KPMG's alleged fraud, breach of fiduciary duty and professional negligence in no way "depend[ed]" on its tortious conduct. Moreover, *Brown* expressly cited *Grigson*'s reasoning for applying equitable estoppel: "We reasoned that equity does not allow a party to 'seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.' " (*Brown, supra,* 462 F.3d at p. 398, quoting *Grigson, supra,* 210 F.3d at p. 528.) This, as we shall see *post*, is not such a case.

### 3. *In re Humana.*

As we have previously noted, some cases have expressly articulated the view we take in this case. Indeed, the Eleventh Circuit, which decided *MS Dealer*, did so in *In re Humana Inc. Managed Care Litigation* (11th Cir. 2002)

285 F.3d 971 (*Humana*).[12] *Humana* expressly stated: "A plaintiff's allegations of collusive behavior between the signatory and nonsignatory parties to the contract do not automatically compel a court to order arbitration of all of the plaintiff's claims against the nonsignatory defendant; rather, such allegations support an application of estoppel only when they 'establish[] that [the] claims against [the nonsignatory are] intimately founded in and intertwined with the obligations imposed by the [contract containing the arbitration clause].' " (*Humana, supra*, 285 F.3d at p. 975, citing *MS Dealer, supra*, 177 F.3d at p. 948.) Further, *Humana* observed, responding to the contention that language in *MS Dealer* supports the application of equitable estoppel when allegations are raised of substantially interdependent and concerted misconduct: "This contention is only tenable if the passage is read completely out of context. *MS Dealer* 'is not a rigid test, and each case turns on its facts.' [Citation.] In all cases, ' "the lynchpin for equitable estoppel is equity," and the point of applying it to compel arbitration is to prevent a situation that "would fly in the face of fairness." ' [Citation.] The purpose of the doctrine is to prevent a plaintiff from, in effect, . . . 'relying on the contract when it works to [his] advantage [by establishing the claim], and repudiating it when it works to [his] disadvantage [by requiring arbitration].' [Citation.] *The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the* sine qua non *of an appropriate situation for applying equitable estoppel.*" (*Humana, supra*, 285 F.3d at p. 976, italics added, citing *Hill v. G E Power Systems, Inc.* (5th Cir. 2002) 282 F.3d 343, 349 (*Hill*) [holding that district court did not abuse its discretion in declining to apply doctrine of equitable estoppel even though complaint alleged collusive scheme to defraud].)[13]

E. *Equitable estoppel cannot be applied in this case to require Goldman and Haines to arbitrate their claims against KPMG and Sidley.*

We return to the circumstances presented in this case. Because equitable estoppel applies only if plaintiffs' claims against the nonsignatory are dependent upon, or inextricably bound up with, the obligations imposed by the

[12] *Humana* was reversed on other grounds in *PacifiCare Health Systems, Inc. v. Book* (2003) 538 U.S. 401 [155 L.Ed.2d 578, 123 S.Ct. 1531].

[13] The Supreme Court of Texas rejected a similar contention, concluding that affiliates of Merrill Lynch could not invoke Merrill Lynch's arbitration agreements through an estoppel theory based on substantially interdependent and concerted misconduct. (*In re Merrill Lynch Trust Co. FSB* (Tex. 2007) 235 S.W.3d 185, 194–195 ["while Texas law has long recognized that nonparties may be bound to a contract under traditional contract rules . . . , there has never been such a rule for concerted misconduct"; no settled principles of federal arbitration law would require plaintiffs to arbitrate with Merrill Lynch's nonsignatory affiliates].)

contract plaintiff has signed with the signatory defendant, we examine the facts alleged in the complaints. That review shows that (1) Goldman and Haines do not rely or depend on the terms of the operating agreements in asserting their claims against KPMG and Sidley, and (2) none of the allegations against KPMG and Sidley are in any way founded in or bound up with the terms or obligations in the operating agreements. The allegations depend solely on the actions of KPMG and Sidley, not on the terms of the operating agreements, for their success. Indeed KPMG and Sidley do not, and cannot, cite a single term or obligation in the operating agreements that has any bearing on the allegations Goldman and Haines make against KPMG and Sidley.

The only allegations tangentially or impliedly referring to the operating agreements are that Goldman and Haines, respectively, were told by KPMG that the buying of options on the foreign currency market would be handled through DGI, "who would prepare the necessary legal documents and arrange for the formation of the limited liability company to generate the tax loss"; that Haber of DGI "formed AD Managed as the limited liability company through which [Goldman] would make the investment, with DGI and Alpha as the founding members and co-managing members"; and that Goldman purchased the options, DGI charged a fee for arranging the transaction (including $600,000 remitted to KPMG), and Goldman "then contributed the [options] to AD Managed as [his] capital investment in AD Managed."

These allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the operating agreements.[14] Nor is there any claim founded in or even tangentially related to any duty, obligation, term or condition imposed by the operating agreements. On the contrary, the claims are fully viable without reference to the terms of those agreements. That being so, the basis for equitable estoppel—relying on an agreement for one purpose while disavowing the arbitration clause of the agreement—is completely absent. (See *Palmer Ventures LLC v. Deutsche Bank AG* (5th Cir. 2007) 254 Fed.Appx. 426, 431–432 (*Palmer*) [even if a plaintiff's claims "touch matters" relating to the arbitration agreement, "the claims are not arbitrable unless the plaintiff relies on the agreement to establish its cause of action"], citing *Hill, supra*, 282 F.3d at pp. 348–349.) We turn briefly to several points KPMG and Sidley raise as to the two circumstances claimed to justify application of equitable estoppel.

---

[14] KPMG concedes the Goldman claims "do not involve breach, performance or interpretation of the AD Managed Operating Agreement . . . ."

1. *Goldman and Haines do not rely on the terms of the operating agreements to make their case against KPMG and Sidley.*

KPMG and Sidley argue that they satisfy *MS Dealer's* first set of circumstances in which equitable estoppel may be applied, namely, "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." (*MS Dealer, supra,* 177 F.3d at p. 947.) By now, of course, it will be clear that Goldman and Haines do *not* rely on, or even mention, the terms of the operating agreements. KPMG and Sidley slough over this requirement by cherry-picking words from the formulations articulated by various courts, and ultimately by disregarding the core of the principle. Thus they claim, for example, that the Haines allegations "logically presuppose the existence of the AD FX Fund and, therefore, of the Fund's Operating Agreement," because the operating agreements were a necessary step in effectuating the tax shelter transactions. But they ignore the fact that "presum[ing] the existence of" an agreement is not a stand-alone principle, but merely an elaboration on the underlying principle, stated in *all* the cases: actual reliance on the terms of the agreement to impose liability on the nonsignatory. Ultimately, KPMG and Sidley simply omit the necessary central core of the standard: the plaintiff's allegations must rely on or depend on " 'the terms of the written agreement' " (*MS Dealer, supra,* 177 F.3d at p. 947), not simply on the fact that an agreement exists. As the court observed in *Palmer*: "While [the document at issue] may play a role in the ultimate outcome of this suit, it is not a part of Plaintiffs' causes of action. . . . In this case, Plaintiffs are not trying to 'have it both ways' [by seeking to hold the nonsignatory liable pursuant to duties imposed by the agreement, but at the same time denying applicability of the agreement's arbitration clause] because Plaintiffs are not relying on the [document] to hold [the nonsignatory defendant] liable. As a result, equitable estoppel does not permit [the nonsignatory] to enforce the arbitration agreement." (*Palmer, supra,* 254 Fed.Appx. at p. 432; see also *Boucher, supra,* 127 Cal.App.4th at p. 272 ["[t]he fundamental point is that a party may not make use of a contract containing an arbitration clause and then attempt to avoid the duty to arbitrate"]; *Boyd, supra,* 981 F.Supp. at p. 1433 ["here the court need not even read, let alone interpret or possibly enforce, the specific terms and conditions of the purchase contracts [containing the arbitration clause] to fully adjudicate the plaintiffs' claims against [the nonsignatory manufacturer]"].)

KPMG also cites throughout its briefs to *Turtle Ridge, supra,* 140 Cal.App.4th 828, a case from this division. But *Turtle Ridge* does not supply what is missing in this case: any reliance by Goldman or Haines on the terms

of the operating agreements to make out their causes of actions against KPMG and Sidley. In *Turtle Ridge*, the opposite is so; Turtle Ridge's claims depended on underlying agreements that had (or incorporated) arbitration clauses. In *Turtle Ridge*, SBC Smart Yellow Pages (SBC) awarded a phonebook delivery contract to Clientlogic, authorizing Clientlogic to subcontract work to Turtle Ridge. (*Id.* at p. 831.) Unknown to Turtle Ridge, SBC had inflated the number of phonebooks to be delivered, effectively defrauding contract bidders whose price was calculated using those numbers. SBC covered up the scheme by terminating its contract with Clientlogic, which in turn terminated its subcontract with Turtle Ridge. Turtle Ridge sued SBC, which sought arbitration, arguing Turtle Ridge's claims arose from its subcontract with Clientlogic, which incorporated the SBC-Clientlogic contract (and its arbitration clause). We held that the test for applying equitable estoppel to an arbitration agreement "is whether the causes of action are intertwined with the contract containing the agreement." (*Id.* at p. 835.) We applied equitable estoppel, because Turtle Ridge's claims against nonsignatory SBC arose from Turtle Ridge's business dealings with SBC and Clientlogic, and those dealings were governed by the SBC-Clientlogic contract and by Clientlogic's subcontract with Turtle Ridge; "outside of those contracts, Turtle Ridge had no business relationship with SBC." (*Id.* at p. 833.) We also pointed out that Turtle Ridge's complaint "presupposed the existence of the contract and subcontract as part of a tripartite, ongoing relationship that benefited SBC, Clientlogic and Turtle Ridge." Several causes of action rested on SBC's use of inflated circulation numbers in soliciting bids for the contract; the claims for interference with prospective economic advantage were intertwined with the subcontract because Turtle Ridge alleged SBC knew that terminating SBC's contract with Clientlogic sounded the subcontract's death knell; and another claim sought payment for work performed under the contract. (*Id.* at pp. 834–835.) In short, in *Turtle Ridge*, the plaintiff was using the underlying contract and subcontract as the foundation for its claims against SBC; Goldman and Haines, by contrast, do not rely at all on the obligations of the operating agreements to make their claims against KPMG and Sidley.

### 2. The Goldman/Haines allegations of concerted misconduct are not founded in or bound up with the terms or obligations of the operating agreements.

KPMG insists the "concerted misconduct" alleged in the complaints is "integrally tied up with" the operating agreements, because but for their execution of the operating agreements, Goldman and Haines could not have invested in the funds and generated their tax losses. But this does not satisfy the requirement that the allegations of concerted misconduct be founded in or

inextricably bound up with the terms and obligations of the operating agreements. It is certainly the case that a limited liability company had to be created to facilitate the tax shelter scheme, and the limited liability company that was created in turn had to have an operating agreement. But the very articulation of KPMG's argument shows that the operating agreements are at least one step removed from the actual transactions that generated the Goldman/Haines complaints against KPMG and Sidley. (Cf. *Hawkins v. KPMG LLP* (N.D.Cal. 2006) 423 F.Supp.2d 1038, 1051 ["plaintiff's claims do not rely on the content of the [agreement] for their success"; "plaintiff's fraud claims depend only on the sale of the tax shelter as a whole"].) In short, the operating agreements which Goldman and Haines signed, in order to become members of the limited liability company through which their tax losses would be generated, were merely incidental to the scheme, and none of the terms in those agreements are alleged to have been violated or otherwise to form any part of the Goldman/Haines complaints. Indeed, the substance of the fraud allegedly perpetrated by KPMG on Goldman and Haines—persuading them to invest in a tax shelter product KPMG knew would likely not survive a challenge by the IRS—occurred well in advance of Goldman's and Haines's execution of the operating agreements, further emphasizing the absence of any equitable basis for permitting KPMG to rely on the arbitration clauses of those agreements. Again, we are returned to the fundamental point: Goldman and Haines are *not* relying in any way on the operating agreements to make their claims against KPMG and Sidley, while at the same avoiding the arbitration clauses of those agreements—and, at bottom, that is the only basis upon which they may be equitably estopped from refusing to arbitrate when they have not agreed to do so.

■ We end this aspect of our discussion with one further point. KPMG insists there are "strong policy reasons" to conclude that a plaintiff's allegations of concerted misconduct by signatories and nonsignatories, standing alone, is a proper basis for applying equitable estoppel. This is, it says, because "the non-defendant signatories, who bargained for resolution in a private forum, become, in essence, parties to a public proceeding—with the resulting loss of time and money—because of their required participation in the litigation," citing *Grigson* and *MS Dealer*. But "policy reasons" alone cannot replace the necessary predicate for the application of equitable estoppel, and nothing in *Grigson* or *MS Dealer* suggests otherwise. The proposition that a court should compel arbitration to avoid denying the signatory defendant the benefit of his arbitration clause, and merely to avoid duplicative litigation, is, to the extent it purports to be based on principles of equitable estoppel, simply wrong. Parties who have not agreed to arbitrate may not be compelled to do so simply because two defendants, one with an arbitration agreement and one without, have colluded to defraud the plaintiff.

After all, *every* conspiracy claim alleges interdependent and concerted misconduct. The fact that some defendants have arbitration agreements and some do not may indeed generate duplicative litigation, and may result in stays of litigation as to some parties while arbitration is ongoing for others or vice versa. But no principle of law—and certainly not the doctrine of equitable estoppel—allows us to decide that a plaintiff who did not agree to arbitrate with a defendant must do so simply because he alleges a conspiracy, and without regard to whether his conduct " 'renders assertion of [his right to a judicial forum] contrary to equity.' " (*Metalclad, supra,* 109 Cal.App.4th at p. 1713.) While, as KPMG and Sidley repeatedly note, federal policy favors arbitration, that policy simply does not apply to parties who have not agreed to arbitrate.

F.  *KPMG's engagement letters with Goldman and Haines further demonstrate the doctrine of equitable estoppel should not be applied to the claims against KPMG.*

KPMG entered into express engagement agreements with Goldman and Haines covering KPMG's services to them—including the tax shelter advice from which the complaints arise. These agreements contained no arbitration clauses, so both sides retained their rights to a jury trial to resolve any disputes between them. In the Goldman case, the trial judge reasoned that KPMG was not entitled to invoke equitable estoppel, as that would effectively supersede a written express agreement containing no arbitration clause. KPMG contends the cases upon which the court relied were inapposite and immaterial because they did not involve equitable estoppel, but rather the contract rule that an implied contract cannot override the terms of an express agreement between the parties. KPMG cites *Choctaw Generation Ltd. v. American Home Assur.* (2d Cir. 2001) 271 F.3d 403 (*Choctaw*), where the court permitted a surety to invoke the arbitration clause of a construction contract to which it was not a party, even though the surety's contract with the plaintiff (the bond) had no arbitration clause.[15]

■ In light of our conclusion that the doctrine of equitable estoppel cannot be properly applied in these cases, we need not dwell on whether or not the trial court correctly relied on the KPMG engagement letters as the

---

[15] The facts in *Choctaw* show a proper application of equitable estoppel, demonstrating that the doctrine requires reliance on the terms of the contract with the arbitration clause. There was an ongoing arbitration between the parties to the construction contract (plaintiff Choctaw and defendant Bechtel), which was "referred to" in "and made a part" of the surety bond; the construction contract dispute entailed the construing of a dozen provisions of the construction contract. The dispute between Choctaw and the nonsignatory surety "turn[ed] upon many of the same provisions," was "linked textually to the Construction Contract, and its merits [were] bound up with the dispute . . . being arbitrated between Choctaw and Bechtel." (*Choctaw, supra,* 271 F.3d at pp. 405–407.)

basis for its order. While it is true that *Choctaw* supports the position that equitable estoppel may be applied despite the existence of an agreement between the parties that has no arbitration clause, it is also fair to point out that equitable estoppel is a rule of contract law that has the effect of implying—albeit as a result of a party's conduct—an agreement to arbitrate. While we need not decide in this case whether the existence of the engagement letters, standing alone, should preclude the use of equitable estoppel, we do pause to make one observation. The existence of engagement letters with KPMG containing no arbitration clauses makes it all the more apparent that the application of an equitable doctrine to require arbitration between parties who have not agreed to arbitrate is entirely inappropriate in this case. One may recall that the "linchpin" for equitable estoppel "is equity—fairness" (*Grigson, supra*, 210 F.3d at p. 528), and that the application of the doctrine is fact specific. (*Id.* at p. 527 ["Each case, of course, turns on its facts"].) As we have seen, unless a party to an arbitration agreement has used the substantive terms of that agreement as the foundation for his claims against a nonsignatory, there is no reason in equity why he should be forced to arbitrate his claims against the nonsignatory. This is especially so where that party actually has a written agreement with the defendant containing no arbitration clause. In short, despite the ubiquity of arbitration clauses in agreements for professional services, KPMG apparently did not wish to use arbitration to decide disputes—such as this one—over its provision of professional services. To allow KPMG nonetheless to assert the right to arbitrate under these circumstances would further denude the doctrine of equitable estoppel of its essence: equity.[16]

## CONCLUSION

The claims Goldman and Haines assert against KPMG and Sidley do not rely or depend on, and are not founded in or inextricably bound up with, the terms of the operating agreements with DGI and Alpha. Accordingly, because Goldman and Haines make no use of the operating agreements with DGI and Alpha in asserting their causes of action against KPMG and Sidley, while at the same time avoiding the arbitration clauses in those agreements, there is no basis in equity for estopping Goldman and Haines from asserting their rights to sue KPMG and Sidley in court.

---

[16] Sidley had no written engagement agreements with Goldman or Haines, asserting New York law did not require it to do so at the time (although California law did so require). We do not quarrel with Sidley's factual statement. We only observe that written retainer agreements often contain arbitration clauses. It would have been easy for Sidley to have included such a provision if it had submitted written retainer agreements to Goldman and Haines. Again, we need not linger on this argument, but note only that the absence of a written engagement letter adds nothing in Sidley's favor to the equity equation.

## DISPOSITION

The orders denying the motions to compel arbitration are affirmed. Goldman and Haines are to recover their costs on appeal.

Bigelow, J., and O'Neill, J.,* concurred.

---

*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.