**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE ANTHONY HENSON and
WILLIAM CINTRON,

No. 16-71818

D.C. No.
4:15-cv-01497-
JSW

ANTHONY HENSON; WILLIAM
CINTRON,
                    *Petitioners*,

v.

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
CALIFORNIA, OAKLAND,
                    *Respondent*,

OPINION

TURN, INC.,
          *Real Party in Interest.*

Petition for Writ of Mandamus

Argued and Submitted May 17, 2017
San Francisco, California

Filed September 5, 2017

Before:  William A. Fletcher and Richard C. Tallman,
Circuit Judges, and Roslyn O. Silver,[*] District Judge.

Per Curiam Opinion

---

**SUMMARY[**]**

---

**Mandamus**

The panel granted a petition for a writ of mandamus, and vacated the district court's order granting Turn, Inc.'s motion to stay the action and compel arbitration, arising from a putative class action brought by Verizon cellular and data subscribers against Turn, Inc., a middle-man for Internet-based advertisements, challenging Turn, Inc.'s alleged use of "zombie" cookies.

The panel weighed the factors in *Bauman v. U. S. Dist. Court,* 557 F.2d 650, 654–55 (9th Cir. 1977), and held that the majority of the *Bauman* factors weighed heavily in favor of granting the writ of mandamus. Specifically, the panel held that because "contemporaneous ordinary appeal" was unavailable, the first *Bauman* factor supported issuance of the writ. The panel held that the second *Bauman* factor also weighed heavily in favor of granting mandamus relief because the subscribers would be prejudiced in a way not correctable on appeal. The panel held that the third *Bauman*

---

[*] The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

factor strongly favored granting the writ because the district court committed clear error by applying New York's equitable estoppel doctrine, rather than California's, and by failing to apply California law correctly. The panel held that the fourth and fifth *Bauman* factors – oft-repeated error and issue of first impression – weighed against granting mandamus relief. The panel concluded that because the first three *Bauman* factors strongly favored mandamus relief, the balance of factors favored issuing the writ.

## COUNSEL

Nimish R. Desai (argued) and Michael W. Sobol, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; Nicholas Diamand, Lieff Cabraser Heimann & Bernstein LLP, New York, New York; Hank Bates, Carney Bates & Pulliam PLLC, Little Rock, Arkansas; Bradley S. Clanton, Clanton Legal Group PLLC, Jackson, Mississippi; for Petitioners.

Michael H. Rubin (argued), Anthony J. Weibell, and Lauren Gallo White, Wilson Sonsini Goodrich & Rosati, San Francisco, California, for Real Party in Interest.

Scott H. Angstreich and Amelia I.P. Frenkel, Kellogg Huber Hansen Todd & Evans PLLC, Washington, D.C., for Amicus Curiae Cellco Partnership DBA Verizon Wireless.

**OPINION**

PER CURIAM:

We consider whether the defendant, a "middle man" for Internet-based advertisements, may invoke an arbitration provision contained in a contract between the plaintiffs and their wireless service provider.

## I. BACKGROUND

Plaintiffs Anthony Henson and William Cintron (collectively, "Henson") are Verizon[1] cellular and data subscribers. Henson and Verizon's contractual relationship is governed by the "My Verizon Wireless Customer Agreement" ("Customer Agreement"), which includes an agreement to arbitrate disputes between them. Defendant Turn, Inc. ("Turn") is a "middle man" for Internet-based advertisements that separately contracts with Verizon to deliver advertisements to Verizon subscribers based on usage data collected from users' mobile devices. The "Turn Audience Platform Agreement" ("TAP Agreement") governs Verizon and Turn's contractual relationship, under which Verizon granted a license to Turn to use its service for targeted advertising in exchange for a percentage of the revenue that Turn received from selling targeted advertising space to its client advertisers.

As a Verizon subscriber, each of Henson's wireless transmissions contained a Verizon Unique Identifier Header

---

[1] Cellco Partnership d/b/a Verizon Wireless ("Verizon" or "Verizon Wireless") is not a party in this matter.

("UIDH"). Turn attached tracking cookies[2] to Verizon subscribers' UIDHs to collect and send their web-browsing and usage data to Turn's servers. Subscribers were allegedly unable to detect, delete, or block these "zombie" cookies attached to their UIDHs.[3] Henson filed a putative class action in the United States District Court for the Northern District of California on behalf of all Verizon subscribers residing in New York against Turn for its alleged use of these "zombie" cookies, claiming that Turn (1) engaged in deceptive business practices in violation of New York General Business Law § 349, and (2) committed trespass to chattels by intentionally interfering with the use and enjoyment of Verizon subscribers' mobile devices.

Henson alleged that Turn exploited users' UIDHs to install its "zombie" cookies, recreated those cookies after users deleted them, collected data about Verizon users without their knowledge, used that data to create profiles that it marked with its own identifier ("Turn ID"), stored those Turn IDs on users' mobile web browsers, and auctioned off users' collected data so that advertisers could place targeted advertisements on their mobile phones. Because Turn works with Google, Facebook, and hundreds of other well-

---

[2] A "cookie" is software code that transmits a user's web-browsing history and other usage data back to the entity that attached the cookie.

[3] According to Henson, if a subscriber deleted Turn's cookie, Turn would attach a new cookie the next time the subscriber visited one of Turn's partner websites. Turn could then repopulate the cookie with the very data the user intentionally deleted, and it could cross-reference the UIDH attached to the user's transmission with Turn's own database of collected data. This allowed Turn to continue collecting information about the user after the user believed the cookie was deleted.

recognized brands, Henson argued Turn's practices had a harmful and wide impact.

Turn moved to dismiss Henson's claims and sought to compel arbitration by invoking the arbitration provision in the Customer Agreement between Henson and Verizon. The Customer Agreement requires Henson and Verizon to arbitrate any disputes arising out of their contract. However, Turn is not a signatory to the Customer Agreement and does not otherwise have an arbitration agreement with Henson. The separate TAP Agreement, between Turn and Verizon, provides that the parties "are independent of each other"; that "nothing in th[e] Agreement creates any partnership, joint venture, . . . or other similar relationship"; and that "neither party shall have the authority to bind the other in any way."[4] Nonetheless, Turn asked the district court to compel arbitration under the doctrine of equitable estoppel because it provided a service to Henson that was closely connected to Henson's Verizon wireless service.

Without conducting a choice-of-law analysis, the district court granted Turn's motion to compel arbitration under New York's equitable estoppel doctrine and stayed the action. Henson timely filed this writ of mandamus to vacate the district court's order compelling arbitration.

---

[4] Although the TAP Agreement was filed under seal in the district court, we conclude that Turn waived any claim of confidentiality as to these portions of the document when it represented on appeal that it acted jointly and in partnership with Verizon to provide targeted advertisements to Verizon's subscribers. The TAP Agreement, the contents of which are highly probative of the question at hand, makes clear that the companies agreed that exactly the opposite was true. *See Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1233 n.9 (9th Cir. 2013).

## II. ANALYSIS

We have jurisdiction to issue writs of mandamus pursuant to the All Writs Act. 28 U.S.C. § 1651. A writ of mandamus is a "drastic and extraordinary" remedy. *Ex parte Fahey*, 332 U.S. 258, 259 (1947). To determine whether a writ of mandamus is warranted, we weigh the *Bauman* factors:

> (1) whether the petitioner has other adequate means, such as a direct appeal, to attain the relief he or she desires; (2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order makes an "oft-repeated error," or "manifests a persistent disregard of the federal rules"; and (5) whether the district court's order raises new and important problems, or legal issues of first impression.

*In re Van Dusen*, 654 F.3d 838, 841 (9th Cir. 2011) (quoting *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977)). Although satisfying the third *Bauman* factor—clear error—is necessary for granting the writ, a petitioner need not satisfy all five factors at once. *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007) (per curiam). Here, the majority of the *Bauman* factors weigh heavily in favor of granting the writ.

### A. Direct Appeal is Unavailable

A writ of mandamus "is not available when the same review may be obtained through contemporaneous ordinary appeal." *Snodgrass v. Provident Life and Accident Ins. Co.*,

147 F.3d 1163, 1165 (9th Cir. 1998) (quoting *Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 519 (9th Cir. 1985)). An order staying proceedings and compelling arbitration is not a final decision that is subject to ordinary appeal under 28 U.S.C. § 1291. *See* 9 U.S.C. § 16(b); *Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1021–23 (9th Cir. 2014). Because "contemporaneous ordinary appeal" is unavailable, the first *Bauman* factor supports issuance of the writ.

## B. Prejudice Not Correctable on Appeal

The second *Bauman* factor also weighs in favor of granting mandamus relief. We generally examine the first and second factors together because the second is closely related to the first. *Douglas*, 495 F.3d at 1068 n.3. Here, the Customer Agreement does not allow Henson to arbitrate his dispute in a representative capacity or on behalf of a class. If Henson is forced to arbitrate, he "has no other adequate means" of ensuring that he can continue as the class representative, and this would prejudice him "in a way not correctable on appeal." *See Bauman*, 557 F.2d at 654. If Henson wins the arbitration, then his individual claims in this action would be rendered moot because they would fully be satisfied, and Henson would lose his status as class representative because he would no longer have a concrete stake in the controversy. *See Douglas*, 495 F.3d at 1068–69. It is doubtful that Henson would be able to avoid mootness by moving to vacate the arbitration award solely because he wanted to continue as the class representative. *See id.* And, it is "doubtful that he could appeal the district court's order confirming an award that fully satisfied his individual claim[s]." *Id.* at 1069. He thus would "have no opportunity to challenge the district court's order compelling the arbitration in the first place." *Id.*

If Henson loses the arbitration, it is also doubtful that he would successfully bring an appeal to this court. If he brings suit in the district court to vacate the arbitration award and to seek a damage award from the district court, Turn could make an offer of settlement that would be very hard to refuse. Until the arbitration award is actually vacated by order of the district court, Henson could represent only himself and would thus have no legal or ethical obligation to refuse the offer.

## C. Clear Error

Although clear error is a highly deferential standard of review in the mandamus context, *Van Dusen*, 654 F.3d at 841, an "order is clearly erroneous for purposes of a mandamus petition if we are left with the definite and firm conviction that a mistake has been committed." *United States v. Ye*, 436 F.3d 1117, 1123 (9th Cir. 2006) (quotation omitted). Here, the district court committed clear error by applying New York's equitable estoppel doctrine, rather than California's, and by failing to apply California law correctly. Because we are left with a definite and firm conviction that a mistake has been committed, the third *Bauman* factor strongly favors granting the writ.

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Turn attempts to invoke the arbitration agreement between Henson and Verizon to compel arbitration, but Henson and Turn do not have an arbitration agreement with each other. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).

"State contract law controls whether parties agreed to arbitrate." *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

The Customer Agreement between Henson and Verizon provides that only the subscriber and Verizon "agree to resolve disputes only by arbitration." Turn is not a signatory to the Customer Agreement. The TAP Agreement between Turn and Verizon provides that the parties "are independent of each other"; that "nothing in this Agreement creates any partnership, joint venture, . . . or other similar relationship"; and that "neither party shall have the authority to bind the other in any way."

Since there is no agreement between Henson and Turn to arbitrate their disputes, Turn argues that the doctrine of equitable estoppel allows it to enforce the arbitration provision in the Verizon Customer Agreement against Henson. "[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). Henson asserts that California law applies to determine whether Turn, as a non-signatory, can compel arbitration under the doctrine of equitable estoppel, while Turn argues that the district court correctly applied New York law because of a choice-of-law provision in the Customer Agreement.

### 1. Choice of Law

The district court erred by applying New York law based on the Customer Agreement's choice-of-law provision. "A choice-of-law clause, like an arbitration clause, is a contractual right and generally may not be invoked by one

who is not a party to the contract in which it appears." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1165 (9th Cir. 1996); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (explaining that whether a choice-of-law provision applies depends on whether the parties agreed to be bound by the contract in which it appears). Here, Henson and Turn never agreed that New York law would govern the disputes between them. And, as discussed below, Henson does not rely on the Customer Agreement in his suit against Turn.

Instead, we apply the choice-of-law principles of the forum state. *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir 2008). Because Henson sued Turn in the Northern District of California, we apply California's choice-of-law principles. Under California's choice-of-law analysis, we will apply New York law only if Turn shows, among other things, that New York law "materially differs from the law of California." *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001). Otherwise, we apply California law. *Id.* Turn concedes, and we agree, that there is no material difference between New York and California's equitable estoppel laws. We therefore look to California's equitable estoppel doctrine to determine whether Turn, as a non-signatory, can compel arbitration.

## 2. California Law

California law permits non-signatories to invoke arbitration agreements in limited circumstances under the doctrine of equitable estoppel. The theory behind equitable estoppel is that a plaintiff may not, "on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Murphy v. DirecTV, Inc.*,

724 F.3d 1218, 1229 (9th Cir. 2013) (quoting *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 543 (Ct. App. 2009)). If this were permitted, then a signatory to an agreement, such as Henson, would "have it both ways"—that is, he could sue the non-signatory, Turn, under the terms of the agreement containing the arbitration clause, but ignore the arbitration requirement because Turn is a non-signatory. *See Goldman*, 92 Cal. Rptr. 3d at 552.

Under California law, Henson will be equitably estopped from avoiding arbitration in two circumstances:

> (1) when [Henson] must rely on the terms of the [Customer Agreement] in asserting its claims against [Turn] or the claims are intimately founded in and intertwined with the [Customer Agreement], and

> (2) when [Henson] alleges substantially interdependent and concerted misconduct by [Turn] and [Verizon] and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the [Customer Agreement].

*Murphy*, 724 F.3d at 1229 (quoting *Kramer*, 705 F.3d at 1128–29, which stated the controlling statement concerning California equitable estoppel law as set forth in *Goldman*, 173 Cal. App. 4th at 218–19).

### a. Reliance on the underlying contract

As to the first circumstance, "merely making reference to an agreement with an arbitration clause is not enough." *Goldman*, 92 Cal. Rptr. 3d at 541 (alterations and quotations omitted). Instead, for equitable estoppel to apply, Henson's

claims against Turn must rely on the terms of the Customer Agreement. *Id.* In other words, Henson's claims must be based on "*the obligations imposed by the [Customer Agreement]*." *Id.* Equitable estoppel is "inapplicable where a plaintiff's 'allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the [Customer Agreement].'" *Murphy*, 724 F.3d at 1230 (quoting *Goldman*, 92 Cal. Rptr. 3d at 551). For example, in *Kramer*, we held that Toyota could not compel arbitration of a consumer class action on the basis of arbitration clauses contained in Purchase Agreements that customers entered into with their dealerships. *See* 705 F.3d at 1124–25. We expressly rejected Toyota's argument that the plaintiffs' claims were necessarily based on the Purchase Agreements merely because the lawsuit was predicated on the bare fact that a vehicle purchase occurred. *Id.* at 1130–31.

Similarly, here, Henson's claims against Turn are not based on the Customer Agreement. Henson's complaint is replete with allegations of wrongdoing against Turn that have nothing to do with the Customer Agreement. Among other allegations, Henson claims that Turn violated Verizon users' "reasonable expectations of privacy by creating zombie cookies that users could neither detect nor delete, and which monitored user behavior well beyond web browsing"; that Turn acted "to disable the standard privacy controls employed by individuals (such as deleting or blocking cookies)"; that Turn "used Class members' personal, private, and confidential data for commercial gain without their knowledge or consent"; and that Turn consistently altered users' mobile devices by "circumventing privacy controls in said devices and causing said devices to transmit information to Turn to which Turn was not entitled." None of these allegations rely on the Customer Agreement or attempt to seek any benefit from its

terms. *See Murphy*, 724 F.3d at 1230. Further, New York's consumer protection statute allows Henson to sue Turn for its allegedly deceptive acts and practices regardless whether Henson signed a Customer Agreement with Verizon. *See id.* at 1231; *accord Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (rejecting equitable estoppel theory under Washington law where the plaintiff's lawsuit stated statutory claims that were separate from the contract itself).[5] Thus, the first circumstance for equitable estoppel does not apply.

### b. Substantial interdependence

As to the second circumstance, "the doctrine of equitable estoppel may apply in certain cases where a signatory to an arbitration agreement attempts to evade arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants." *Murphy*, 724 F.3d at 1231 (quotation omitted). Mere "allegations of substantially interdependent and concerted misconduct by [Verizon] and [Turn], standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the [Customer Agreement]." *Goldman*, 92 Cal. Rptr. 3d at 541. "Even where a plaintiff alleges collusion, 'the *sine qua non* for allowing a nonsignatory to enforce an arbitration clause based on equitable estoppel is that the claims the plaintiff asserts against the nonsignatory are dependent on or inextricably bound up with the contractual obligations of the

---

[5] We also note that many of the California cases permitting non-signatories to compel arbitration under an equitable estoppel theory involve contract-based causes of action, such as tortious interference or breach of contract. *See Murphy*, 724 F.3d at 1231 n.7 (citing cases).

agreement containing the arbitration clause.'" *Murphy*, 724 F.3d at 1231 (quoting *Goldman*, 92 Cal. Rptr. 3d at 537).

Here, Henson does not allege Verizon colluded with Turn. On the contrary, Henson alleges that "Turn conducted its practices in secret" and acted without Verizon's knowledge, consent, or approval. Indeed, Henson claims that Verizon publicly rebuked Turn's alleged practices upon discovering them. We also reject Turn's argument that Henson's claims are based on Turn and Verizon's interdependent and concerted conduct because Turn engaged in the challenged conduct in partnership with Verizon. The TAP Agreement between Turn and Verizon explicitly provides that "Turn and Verizon are independent of each other and nothing in this Agreement creates any partnership, joint venture, . . . or other similar relationship." As such, the second circumstance for equitable estoppel does not apply here.

The district court committed clear error in holding that equitable estoppel applied to compel arbitration under the Customer Agreement. Thus, the third *Bauman* factor weighs in favor of granting mandamus relief.

### D. Oft-Repeated Error and Issue of First Impression

The fourth and fifth *Bauman* factors weigh against granting mandamus relief. There is nothing before us that suggests the district court's error has been made more than once. Nor is there anything new about the application of equitable estoppel. *See Bauman*, 557 F.2d at 655; *McDonnell-Douglas Corp. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 523 F.2d 1083, 1087 (9th Cir. 1975). To grant mandamus relief, however, "all five factors need not be satisfied at once." *Douglas*, 495 F.3d at 1066 (quotation

omitted). "In the final analysis, the decision of whether to issue the writ lies within our discretion." *Van Dusen*, 654 F.3d at 841.

Because the first three *Bauman* factors strongly favor mandamus relief, we conclude that the balance of factors favors issuing the writ. The district court's order granting Turn's motion to stay the action and compel arbitration is vacated.

Turn shall bear all costs of appeal. *See* Fed. R. App. P. 39(a)(3).

**PETITION GRANTED.**