Filed 11/3/22; Certified for Publication 12/1/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PACIFIC FERTILITY CASES | A158155<br><br>(San Francisco City & County<br>Super. Ct. No. CGC18565215,<br>JCCP No. 5021) |

Plaintiffs in these coordinated cases contracted with defendant Pacific Fertility Center (Pacific) for fertility-related services, including egg and embryo cryopreservation and long-term freezer storage.[1]  They filed suit after one of the cryogenic storage tanks (Tank Four) used to preserve their eggs and embryos failed.  Defendant and appellant Chart Inc. (Chart) manufactured the storage tank.  Defendants and appellants Praxair, Inc., and Praxair Distribution, Inc. (collectively, Praxair[2]) sold the tank to Pacific and assisted with its installation.

Plaintiffs signed informed consent agreements and arbitration agreements with Pacific, but not with Chart or Praxair.  Chart and Praxair

---

[1]  Pacific is not a party to this appeal, the parties having stipulated that plaintiffs' claims against it will be resolved through arbitration.

[2]  Praxair Distribution Inc. is a subsidiary of Praxair Inc.

1

nevertheless filed motions to compel arbitration on equitable estoppel grounds, which the trial court denied.[3] On appeal, they continue to press their equitable estoppel arguments. We affirm.

## BACKGROUND

On engaging Pacific's services, plaintiffs signed " 'Informed Consent and Agreement to Perform Egg Cryopreservation' " forms.

These forms provided in part: "In spite of reasonable precautions, any of the following may occur in the lab that would prevent the establishment of a pregnancy: [¶] . . . [¶] Bacterial contamination or a laboratory accident may result in loss or damage to some or all of the eggs or embryos. [¶] Laboratory equipment may fail and/or extended power losses can occur which could lead to the destruction of eggs, sperm and embryos."

The consent forms further provided: "<u>Dispute Resolution: Medical Claims.</u> It is understood that any dispute as to medical malpractice, that is, as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided in a separate arbitration agreement signed by the parties." They additionally provided: "<u>Dispute Resolution: Other Claims.</u> Except for any claim, controversy or dispute covered by the Arbitration Agreement, any claim, controversy or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity of this Agreement . . . shall be submitted to mediation in the County of San Francisco, California before a single mediator."

---

[3] Former defendants Pacific MSO, LLC and Prelude Fertility, Inc., also moved, unsuccessfully, to compel arbitration. They subsequently reached a settlement with plaintiffs, and pursuant to the parties' joint request, we have dismissed their appeals.

2

In addition to the informed consent forms, plaintiffs signed arbitration agreements. Article 1 of these agreements provided: "It is understood that any dispute as to medical malpractice, that is, as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration."

The arbitration agreements further provided "Patient understands and agrees that any dispute of the sort described in Article 1 between Provider and Patient will be subject to compulsory binding arbitration." It defined "Provider" as including "the undersigned doctor, nurse practitioner, nurse midwife, or other health care provider and his or her professional corporation or partnership, and any employees, agents, successors-in-interest, heirs and assigns of the foregoing individuals or entities. The provider signing this agreement signs it on behalf of all the foregoing individuals and entities, and intends to bind each of them to arbitration to the full extent permitted by law."

Chart and Praxair were not signatories to either the informed consent or arbitration agreements.

Following the failure of Tank Four, plaintiffs in these 54 coordinated cases filed a "Master Complaint" alleging numerous causes of action. As to Chart and Praxair, the complaint alleged causes of action for negligent failure to recall the tank, strict products liability (for failure to warn,

3

manufacturing defect, and design defect based on both the consumer expectations test and the risk utility test), general negligence, and violation of the Unfair Competition Law.

After plaintiffs agreed to arbitrate their claims against Pacific, Chart and Praxair moved to compel arbitration of the claims asserted against them on equitable estoppel grounds. The trial court denied their motions, and Chart and Praxair timely appealed.

## DISCUSSION

### *Standard of Review*

"On appeal from an order denying a petition to compel arbitration, we review the trial court's factual determinations under the substantial evidence standard, and we review the legal issues independently. [Citations.] Specifically, we independently consider the question of whether and to what extent a nonsignatory may enforce an arbitration agreement." (*Jarboe v. Hanlees Auto Group* (2020) 53 Cal.App.5th 539, 547.) " '[W]e review the trial court's order, not its reasoning, and affirm an order if it is correct on any theory apparent from the record.' " (*Adajar v. RWR Homes, Inc.* (2008) 160 Cal.App.4th 563, 571, fn. 3.)

### *Equitable Estoppel*

" ' "Generally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it." [Citations.] "There are exceptions to the general rule that a nonsignatory to an agreement cannot be compelled to arbitrate and cannot invoke an agreement to arbitrate, without being a party to the arbitration agreement." ' [Citation.] ' " 'As one authority has stated, there are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-

4

piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." ' " ' "
(*Pillar Project AG v. Payward Ventures, Inc.* (2021) 64 Cal.App.5th 671, 675.)

"Equitable estoppel generically ' "precludes a party from asserting rights 'he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity." ' [Citations.] [¶] So, if a plaintiff relies on the terms of an agreement to assert his or her claims against a nonsignatory defendant, the plaintiff may be equitably estopped from repudiating the arbitration clause of that very agreement. In other words, a signatory to an agreement with an arbitration clause cannot ' "have it both ways" '; the signatory 'cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.' " (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 220 (*Goldman*), quoting G*rigson v. Creative Artists Agency* (5th Cir. 2000) 210 F.3d 524, 528.[4]) As *Grigson* explained, "[t]he linchpin for equitable estoppel is equity—fairness." (*Grigson,* at p. 528.)

In the context of arbitration, there are two circumstances in which equitable estoppel can apply. The first is " 'when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory.' (*MS Dealer Service Corp. v. Franklin* (11th Cir.1999) 177 F.3d 942,

---

[4] Where, as here, "the agreements relied upon to compel arbitration . . . evidence transactions involving commerce, as defined in the Federal Arbitration Act (9 U.S.C. § 1 et seq.), federal law governs the interpretation of the agreements. [Citation.] Accordingly, decisions of the lower federal courts, while not binding, are persuasive authority." (*Goldman, supra,* 173 Cal.App.4th at p. 219.)

947[, abrogated on another ground in *Lawson v. Life of the South Ins. Co.* (11th Cir. 2011) 648 F.3d 1166, 1171]. . . .)" (*Goldman, supra,* 173 Cal.App.4th at p. 218.)  The second is "when the claims against the nonsignatory are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause.  In other words, allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement." (*Id*. at p. 219, italics omitted.)

### *Intertwined Claims*

Relying on *In re Apple iPhone 3G Products Liability Litigation* (N.D.Cal. 2012) 859 F.Supp.2d 1084 (*Apple II*), Chart and Praxair maintain plaintiffs' claims against them are "intimately founded in and intertwined with their arbitration agreement with [Pacific]." (Boldface & capitalization omitted.)  They assert the plaintiffs' claims "presume[] the existence of a contract for the storage of their biological material, and Plaintiffs rely upon those contracts in asserting their claims."

In *Apple I*, the plaintiffs sued Apple, Inc. (Apple) and AT&T Mobility, LLC (AT&T) for violation of the California Unfair Competition law, Consumer Legal Remedies Act, and the Magnuson-Moss Warranty Act, alleging they misrepresented "the capabilities of the iPhone 3G on [AT&T's] 3G data network." (*In re Apple iPhone 3G Products Liability Litigation* (N.D.Cal. 2010) 728 F.Supp.2d 1065, 1067 (*Apple I*).  The plaintiffs alleged they "entered into agreements with Apple or its agents and received uniform warranties in connection with the purchase of [iPhones]." (*Apple II, supra,* 859 F.Supp.2d at p. 1090.)  AT&T was " 'the exclusive provider of the

6

telephone and data service plans for the iPhone 3G. . . .' " (*Id.* at p. 1091; *Apple I, supra,* 728 F.Supp.2d 1065, 1067–1068.)  The plaintiffs further alleged that they "accepted [AT&T's] terms of service," and " 'entered into a monthly agreement for iPhone service.' " (*Apple II,* at p. 1091.)

AT&T's terms of service included an arbitration provision, and it duly moved to compel arbitration of the claims against it.[5] (*Apple II, supra,* 859 F.Supp.2d at p. 1091.)  Observing that the plaintiffs "themselves allege[d] that each of them accepted [AT&T's] terms of service" (*ibid.*) the court ruled they "accepted [AT&T's] terms of service, including the arbitration provision at issue.  (*Id.* at p. 1092.)

Apple also sought to compel arbitration, claiming equitable estoppel mandated arbitration of plaintiffs' claims against it, as well.  (*Apple II*, *supra*, 859 F.Supp.2d at p. 1093.)  The district court explained that two requirements must be met for equitable estoppel to apply: "(1) the subject matter of the dispute must be 'intertwined with the contract providing for arbitration'; and (2) there must be a 'relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.' " (*Id.* at p. 1096.)

As to the " 'intertwining' " requirement, the court noted "[p]laintiffs themselves have contended throughout this litigation that their claims against Defendant Apple and Defendant [AT&T] arise from their service agreements with [AT&T]." (*Apple II*, *supra*, 859 F.Supp.2d at p. 1096.) "Plaintiffs' allegations," said the court, "are based on the core allegation that

---

[5] The plaintiffs resisted arbitration only as to their Warranty Act cause of action.  (*Apple II*, *supra,* 859 F.Supp.2d at p. 1089.)

7

the [AT&T] 3G network could not accommodate iPhone 3G users, and that Plaintiffs were deceived into paying higher rates for service which could not be delivered on the 3G network." (*Ibid*.) The court thus concluded the plaintiffs' claims against Apple were " 'intertwined' " with their contracts with AT&T "insofar as Plaintiffs only had access to the [AT&T] 3G network because they had signed contracts with [AT&T] which granted them access to that network." (*Ibid*.)

As to the " 'relationship among the parties' " requirement, the district court observed "Plaintiffs themselves have alleged throughout this litigation that there is a 'relationship' between [Apple and AT&T.]" (*Apple II*, *supra*, 859 F.Supp.2d at p. 1096.) Indeed, the plaintiffs alleged Apple and AT&T "(1) jointly 'engaged in a campaign' to make misrepresentations to consumers; (2) 'acted in concert with each other,' making them 'each legally responsible in some manner for the unlawful acts of the other'; and (3) have a 'close relationship' predicated on a 'joint agreement,' '[t]hrough' which they acted to mislead consumers." (*Id*. at p. 1097.)

The district court thus concluded "because Plaintiffs have asserted claims in this case that arise from their contractual relationship with [AT&T] in which they allege that both [Apple and AT&T] jointly subverted their rights under the contract, Plaintiffs are now estopped from refusing to arbitrate their claims against Defendants [AT&T] and Apple jointly." (*Apple II*, *supra*, 859 F.Supp.2d at p. 1097.)

Chart and Praxair assert *Apple II* holds that "a plaintiff's allegations are intertwined with an agreement containing an arbitration provision *when the dispute would not have arisen absent that agreement*." (Italics added.) However, they focus on only one sentence of *Apple II's* conclusion—that the plaintiffs' "allegations are 'intertwined' with their contracts with Defendant

8

[AT&T], insofar as Plaintiffs only had access to the [AT&T] 3G network because they had signed contracts with Defendant [AT&T] which granted them access to that network." (*Apple II*, *supra*, 859 F.Supp.2d at p. 1096.)

But *Apple II's* full analysis was not the mere "but-for" test Chart and Praxair claim. As we have quoted above, the *Apple II* court focused on the plaintiffs' allegations that their claims against Apple and AT&T arose "from their service agreements with [AT&T]." (*Apple II*, *supra*, 859 F.Supp.2d at p. 1096.) The court pointed out the "[p]laintiffs repeatedly requested that the Court certify a single unified class of '[a]ll persons in the United States . . . who purchased an iPhone 36 *and entered into an [AT&T] 3G service plan. . . .*'" (*Ibid.*) The court further emphasized it had "repeatedly found that [p]laintiffs' allegations . . . are based on the core allegation that the [AT&T] 3G network could not accommodate iPhone 3G users, and that [p]laintiffs were deceived into paying higher rates for service which could not be delivered on the 3G network." (*Ibid.*)

Thus, as the trial court correctly stated, the analysis is not a simple "but for" test, but whether plaintiffs' claims demonstrate " 'actual reliance on the terms of the [Pacific] agreement[s] to impose liability.' " Plaintiffs' claims against Chart and Praxair do not rely on the terms of their agreements with Pacific. Nor do plaintiffs allege concerted action or an ongoing relationship among Pacific, Praxair, and Chart. Thus, the circumstances here are distinguishable from those in *Appel II.*

As the court in *DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346 aptly observed, the argument Chart and Praxair advance "confuses the concept of 'claims founded in and intertwined with the agreement containing the arbitration clause' with but-for causation. A standard indemnity claim, for example, does not exist but for the precursor

9

action giving rise to it. Nevertheless, in those circumstances, the doctrine of equitable estoppel does not bind nonsignatory indemnitors to an arbitration agreement between the parties to the underlying action when, as here, the indemnity claims are not founded in the contract containing the arbitration provision and there is no preexisting relationship between the defendants on which to base an estoppel." (*Id.* at pp. 1356–1357, italics omitted.)

Chart and Praxair also rely on *Mance v. Mercedes-Benz USA* (N.D.Cal. 2012) 901 F.Supp.2d 1147 (*Mance*). In that case, the plaintiff purchased a Mercedes-Benz automobile from a Mercedes-Benz dealer (Dealer) and signed a "Retail Installment Contract" containing an arbitration clause. (*Id.* at pp. 1152–1153.) Mercedes-Benz "expressly warranted . . . 'to preserve or maintain the utility or performance of the subject vehicle.' " (*Id.* at p. 1152.) After many unsuccessful attempts to have his car repaired, plaintiff sued Mercedes-Benz, but not Dealer, for breach of express and implied warranty and under the California "Lemon Law." (*Id.* at p. 1153.)

Mercedes-Benz moved to compel arbitration, asserting equitable estoppel applied. (*Mance, supra,* 901 F.Supp.2d at p. 1155.) The court, noting that the plaintiff had not brought any claims against the Dealer, first concluded "there are no claims against a nonsignatory [to the arbitration agreement] that are 'inherently bound up' with claims against a signatory."[6] (*Mance,* at p. 1157.) As to whether plaintiff's claims against Mercedes-Benz arose out of the underlying contract with Dealer, the court concluded the

---

[6] Contrary to Chart and Praxair's assertion, the *Mance* court did *not* "find[] the plaintiff's claims were 'founded in and intertwined with' the underlying contract between the plaintiff and the dealership." To the contrary, the court found "only the first theory of equitable estoppel applies," noting " ' "intertwining" requires at least two threads to weave together.' " (*Mance, supra,* 901 F.Supp.2d at p. 1157, quoting *Southern Energy Homes, Inc. v. Kennedy* (Ala. 2000) 774 So.2d 540, 545.)

10

claims for breach of warranty were "premised on, and [arose] out of, the [purchase] contract," because the claims " 'make[] reference to or presume[] the existence of' the underlying contract." (*Id.* at p. 1157.) The court explained "it would not be fair to allow Mr. Mance to rely upon his signing the contract to buy the car and get the warranty but to prevent Mercedes-Benz from attempting to enforce the contract's arbitration clause. (*Ibid.*) Accordingly, the court granted Mercedes-Benz's motion to compel arbitration. (*Ibid.*)

In the instant case, however, the claims plaintiffs have asserted against Chart and Praxair—negligent failure to recall, strict products liability (based on failure to warn, manufacturing defect, and design defect based on both the consumer expectations test and the risk utility test), negligence, and violation of the Unfair Competition Law—are not premised on, nor did they arise out of, the plaintiffs' fertility services agreements with Pacific. To the contrary, these claims are based on an asserted defect in Tank 4, and on the alleged negligence and other acts or omissions of Chart and Praxair. As the trial court concluded, the legal duties allegedly breached by Chart and Praxair did not " 'arise from the agreement[s] containing the arbitration clause.' "[7] For this reason, alone, the trial court's order denying arbitration withstands challenge on appeal.

---

[7] As the Ninth Circuit explained in affirming the district court's denial of Chart's motion to compel arbitration in a related federal action, "[i]f the claims 'are fully viable without reference to the terms of [the Pacific agreements],' equitable estoppel does not apply." (*In re Pacific Fertility Center Litigation* (9th Cir. 2020) 814 Fed.Appx. 206, 209, citing *Goldman, supra,* 173 Cal.App.4th at p. 551.)

### *Interdependent and Concerted Misconduct Requirement*

Chart and Praxair also maintain plaintiffs have alleged " 'substantially interdependent and concerted misconduct' " by Pacific and them. They assert the plaintiffs' claims all "arise from a single incident" involving interdependent conduct as to the "performance, operation, and maintenance of Tank 4. . . ."

"[A] nonsignatory may compel arbitration only when the claims against the nonsignatory are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause. In other words, allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement." (*Goldman*, *supra*, 173 Cal.App.4th at p. 219, italics omitted.)

Plaintiffs, however, did not allege "interdependent and concerted misconduct" on the part of Pacific, on the one hand, and Chart and Praxair, on the other. Their claims against Pacific all arose out if its failure to disclose to plaintiffs that it had "ceded control over storage of Plaintiffs' eggs and embryos to Prelude and Pacific MSO." Plaintiffs, accordingly, alleged causes of action against Pacific for fraudulent concealment of that information, negligent misrepresentation, violation of the Unfair Competition Law and violation of the Consumers' Legal Remedies Act. These are fundamentally different claims than plaintiffs allege against Chart and Praxair.

Chart and Praxair assert the trial court "did not apply the most directly applicable line of authority," (boldface & capitalization omitted) asserting it should have relied on *Boucher v. Alliance Title Co., Inc.* (2005)

127 Cal.App.4th 262 (*Boucher*), rather than *Goldman*. In *Boucher*, the plaintiff sued Financial Title Company (Financial) and Alliance Title Company (Alliance) for claims arising out of a written employment agreement with Financial containing an arbitration clause. (*Id.* at p. 265.) After Financial informed the plaintiff all of its "operations or assets were being transferred" to Alliance and he would "no longer be working for Financial," he sued, alleging Alliance "rejected and refused to honor the . . . employment contract" with Financial. (*Id.* at pp. 265, 267–268.)

The trial court granted Financial's motion to compel arbitration but denied Alliance's motion. (*Boucher, supra,* 127 Cal.App.4th at p. 266.) On appeal, Alliance asserted the doctrine of equitable estoppel applied. The Court of Appeal reversed. (*Id.* at pp. 272–273.)

The appellate court explained " '[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory.' " (*Boucher, supra,* 127 Cal.App.4th at p. 269.) The plaintiff's claims against Alliance "rely on, make reference to, and presume the existence of" the employment agreement with Financial. (*Id.* at p. 272.) Indeed, the plaintiff alleged Alliance "failed to pay him accrued wages . . . due under the terms of the . . . employment agreement" with Financial, breached the employment agreement "causing plaintiff damages in the form of lost earnings and other employment benefits due under that agreement," required him to reject the employment agreement, and asked him to disclose confidential information in violation of the agreement. (*Ibid.*) Given these allegations, the appellate court concluded the "plaintiffs' claims against [Alliance] are intimately founded in and intertwined with [the employment agreement with Financial]." (*Id.* at pp. 273–274.)

13

The circumstances here are entirely different. In *Boucher*, the plaintiff sought to enforce the terms of his employment agreement with Financial against Alliance. Plaintiffs in the instant case, however, are not seeking to enforce the terms of their agreements with Pacific against Chart and Praxair. Nor does the court need to look to the plaintiffs' agreements with Pacific to determine liability as to Chart or Praxair. To the contrary, plaintiffs' claims against Chart and Praxair are viable without reliance on the terms of the fertility services agreements with Pacific. Thus, for this reason, as well, the court's order denying arbitration as to Chart and Praxair withstands challenge on appeal.

### Comparative Fault and Risk of Inconsistent Obligations

Chart and Praxair also claim arbitration of the claims against them is required to prevent "unfair apportionment of responsibility between the different Defendants." Noting that "[u]nder comparative liability schemes, the alleged loss must be divided up based on each Defendant's liability," they maintain "adjudication of this action should take place in one forum where one factfinder can apportion responsibility or . . . evaluate settlements and comparable responsibility. . . ."

Chart and Praxair cite no authority, however, supporting their assertion that comparative fault issues are a factor to be considered in determining whether arbitration should be compelled on the basis of equitable estoppel. The cases on which they rely—*Dreamweaver Andalusians, LLC v. Prudential Ins. Co. of America* (2015) 234 Cal.App.4th 1168, 1171 and *Van Zant v. Apple Inc.* (2014) 229 Cal.App.4th 965, 967-968 (*Van Zant*)—concern whether the plaintiffs therein failed to join indispensable parties.

14

Only *Van Zant* even mentions arbitration. In that case, the plaintiff brought a class action against Apple alleging "false advertising, breach of warranty, and other claims relating to Apple's marketing and sales of the iPhone 3G." (*Van Zant*, *supra*, 229 Cal.App.4th at p. 967.) The trial court ruled AT& T Mobility LLC—the cellular network carrier for the iPhone 3G— was a necessary party. (*Id.* at p. 968.) The Court of Appeal reversed, concluding there was no substantial risk of multiple or inconsistent obligations based on "arbitrations that may arise." (*Id.* at p. 977.) The court explained that "[e]ven if arbitration proceedings were pending or ongoing . . . inconsistent *rulings* are not the same as inconsistent *obligations*." (*Ibid.*) " ' "[I]nconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." [Citation.] In contrast, inconsistent adjudications or results occur when a party wins on a claim in one forum and loses on another claim from the same incident in another forum.' " (*Ibid.*) A decision on Pacific's comparative fault in the arbitration proceeding, however, would not bind Chart and Praxair. "[A]n arbitration award does not have collateral estoppel effect in favor of nonparties to an arbitration unless the arbitral parties so agree." (*Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1081, superseded by statute on another ground as stated *in Ferguson v. Corinthian Colleges, Inc.* (9th Cir. 2013) 733 F.3d 928, 937.)

As the trial court concluded, "[t]he issue of comparative fault and joint liability on certain issues . . . does not inform the equitable estoppel analysis unless the joint liability is based on the same or similar legal theories and/or

15

facts that underlie the obligations under Plaintiffs' contracts with [Pacific]." That, however, is not the case here.[8]

## DISPOSITION

The order denying arbitration is affirmed. Costs on appeal to respondents.

---

[8] We deny Chart and Praxair's request for judicial notice of Chart's Third-Party Complaint against Pacific in the related federal court action. For the reasons we have discussed, the Third-Party Complaint is not relevant to whether arbitration can be compelled on the basis of equitable estoppel. (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1144, fn. 5 ["even though certain records may be judicially noticed, they must be relevant to the 'legal question at hand.' "].)

_____

Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Devine, J.*


*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A158155, Pacific Fertility Cases

Filed 12/1/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PACIFIC FERTILITY CASES | A158155 <br><br> (San Francisco City & County Super. Ct. No. CGC18565215, JCCP No. 5021) <br><br><br> ORDER CERTIFYING OPINION FOR PUBLICATION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

      The opinion in the above-entitled matter, filed on November 3, 2022, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:                        _____

                                  Acting P. J.

Trial Court: San Francisco City and County Superior Court

Trial Judge: Hon. Teri L. Jackson

Counsel:

Lieff, Cabraser, Heimann & Bernstein, LLP, Elizabeth J. Cabraser, Lexi J. Hazam, Sarah Robin London and Tiseme Gabriella Zegeye; Walkup, Melodia, Kelly & Schoenberger, Michael A. Kelly and Doris Cheng; Hersh & Hersh, Nancy Hersh; Law Offices of Tiffany J. Gates, Tiffany J. Gates for Plaintiffs and Respondents.

Morgan Lewis & Bockius LLP, Thomas M. Peterson, Molly M. Lane, David L. Schrader and Megan A. Suehiro; Faegre Baker Daniels LLP, Tarifa B. Laddon and Michael Jaeger; Sheuerman, Martini, Tabari, Zenere & Garvin, Marc G. Cowde; Swanson Martin & Bell, LLP, John J. Duffy and Kevin Ringel for Defendants and Appellants.